2016 IL App (1st) 153034WC

Opinion filed:  November 10, 2016

NO. 1-15-3034WC

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION
_____

| | | |
|---|---|---|
| CALUMET SCHOOL DISTRICT # 132, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15-L-50266 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION, *et al.* | ) | Robert Lopez Cepero, |
| (Jonathan Jordan, Appellant). | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    The claimant, Jonathan Jordan, a middle school science teacher, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)), against the employer, Calumet School District #132, seeking compensation for an accidental injury he sustained on March 23, 2011, while participating in a student/teacher basketball game in the employer's gymnasium after school.  After an arbitration hearing, the arbitrator awarded the claimant benefits under the Act, finding that he was not engaged in a "voluntary recreational program" under

section 11 of the Act (820 ILCS 305/11 (West 2010)) at the time of his injury and that his injury arose out of and in the course of his employment. The employer sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission), which affirmed and adopted the arbitrator's decision. The employer filed a timely petition for judicial review in the circuit court of Cook County, which reversed the Commission's decision, finding that the claimant was participating in a "voluntary recreational program" under section 11 of the Act at the time of his injury and that his injury, therefore, did not arise out of and in the course of his employment. The claimant filed a timely appeal. For the reasons that follow, we reverse the judgment of the circuit court and reinstate the Commission's decision.

¶ 2                                    BACKGROUND

¶ 3     On April 12, 2011, the claimant filed an application for adjustment of claim under the Act against the employer, seeking compensation for an accidental injury he sustained on March 23, 2011. The following facts are taken from the evidence presented at the arbitration hearing, which was held on August 8 and September 17, 2013.

¶ 4     At the time of his injury, the claimant was a science teacher for the employer at Calumet Middle School (school). He had a contract to teach for the 2010 to 2011 school year, with a starting date of August 23, 2010, and a salary of $37,554 per year. The employer offered a wage statement, which showed that the claimant received bi-weekly gross payments of $1,444.38, netting $1,075.56.

¶ 5    The claimant was also an instructor at Triton College at the time of his injury. He earned $4,007 for the fall semester at Triton College, which the employer stipulated was to be included in calculating his average weekly wage.

¶ 6    The claimant testified that all teachers were expected to attend and participate in afterschool activities involving student participation, such as open houses, parent/teacher conferences, dances, and performances, without additional compensation. He stated that he considered attendance at, and participation in, such activities to be a part of his job.

¶ 7    The claimant testified that he became aware of the afterschool basketball program at the school a couple of weeks before he was injured. He stated that the school principal, Corey Levy, and another colleague told him that the afterschool basketball program was designed to reward students who were performing well in school and staying out of trouble. He testified that the students were allowed to play basketball with some teachers, which they enjoyed. He stated that he liked the idea of building rapport with the students and rewarding the students for doing the right thing, but he was leery of playing basketball because of the risk of being injured. He testified that he was not a basketball player. He did not play basketball in high school or college, and he had not participated in the afterschool basketball program before the date of his injury.

¶ 8    The claimant testified that Levy had first asked him to participate in the afterschool basketball program a couple of weeks before his injury. He stated that he had hemmed, hawed, and stalled and that he had not played that week. He testified that Levy had asked him to participate in the game the following week and that he had said, "maybe another time." He stated that he was hoping that Levy would stop asking him to

participate. He explained that he wanted to attend the games but that he did not want to play. He testified that on the day before he was injured Levy had asked him for the third time to participate in a basketball game the next day, and he agreed to play.

¶ 9 The claimant testified that, at the time of these conversations with Levy, he had not yet received a contract to teach for the next school year; nor had he received his performance review, which he expected to receive by the end of March. He stated that he was concerned that, if he refused to participate, he would get on Levy's "bad side," that he would not be viewed as a team player, that it would negatively affect his performance review, or that his contract would not be renewed. He testified that, although he was not ordered to participate in the basketball game, he felt pressured the third time Levy cornered him. He stated that he felt strongly that if he refused to participate it would impact his ability to get a good review and to obtain a contract for the next school year.

¶ 10 On March 23, 2011, the claimant played in the student/teacher basketball game, which was held immediately after school in the gymnasium. He testified that there were five students playing against five teachers, including Levy.

¶ 11 The claimant testified that, during the game, the teachers who were present were responsible for overseeing the welfare of the students. He stated that students were not required to have parents or guardians present; nor did the school hire any outside personnel to supervise the students. He testified that, if an incident or emergency occurred during the game, it was the teachers' responsibility to take appropriate action in accordance with their duties as staff members. He stated that he believed the game was a

school-sanctioned event and that his responsibilities as a teacher at the school did not end just because the bell had rung and he was on the basketball court with the students.

¶ 12    The claimant testified that, as he was going up for a jump shot during the game, a student ran through his legs, spinning him in the air and causing him to fall to the ground onto his left arm.  He was taken to the emergency room at MetroSouth Medical Center. X-rays showed a left forearm fracture of the proximal shaft.  He was given pain medication, taken off work, and instructed to follow up with an orthopedic surgeon.

¶ 13    The following day, the claimant saw Dr. Samuel Park, an orthopedic surgeon.  Dr. Park diagnosed a displaced left radial shaft fracture and performed an open reduction and internal fixation of the left radial shaft fracture at Good Samaritan Hospital the same day.

¶ 14    After the surgery, the claimant underwent physical and occupational therapy.  He was released to return to work with no use of his left arm effective April 12, 2011.  He continued following up with Dr. Park, who subsequently noted elbow flexion limitations and stiffness on examination.  By July 25, 2011, Dr. Park noted that X-rays showed delayed healing of the fracture and a possible non-union.  Dr. Park ordered a bone stimulator and additional therapy.

¶ 15    The claimant last saw Dr. Park on January 16, 2012.  Dr. Park noted that he had no bony tenderness, full elbow flexion and extension, limited elbow pronation to 60 degrees, and no radial shaft tenderness.  X-rays showed that the fracture had healed.  Dr. Park released him to full duty work and placed him at maximum medical improvement.

¶ 16    The claimant testified that he was not offered a contract to return to the school for the next school year.  He accepted a position at another school, where he is still teaching.

¶ 17    The claimant testified that his arm and elbow still hurt every day. He stated that cold weather and changes in the weather cause pain inside the arm. He testified that he cannot fully pronate his left wrist. He stated that when he began therapy he was unable to bend/pronate/turn his elbow but that he now has almost full range of motion and some ability to pronate and turn his elbow. He testified that he has pain when doing any lifting with his left arm and that he has difficulty doing certain things, such as working on his house, typing, tying his shoes, turning door knobs, and lifting heavy objects.

¶ 18    Steven Corley testified on the employer's behalf. He stated that he was a special education assistant at the school on the date of the claimant's injury and that he is currently the school's coordinator of safety.

¶ 19    Corley testified that the claimant broke his arm during an afterschool basketball game, which he stated was "just an impromptu basketball game between students and teachers" to challenge one another. He stated that he played in the game and recruited other teachers to play but that his participation was a "one time thing." He testified that participation was strictly voluntary. He stated that there were between 30 and 40 staff members at the school and that teachers were not required to participate. He testified that, to his knowledge, no teachers were ever punished for not participating or given incentives to participate. He stated that he did not believe his refusal to participate would affect his review and that, to his knowledge, no bad reviews were given for not participating. However, he acknowledged that he would not know if anyone had gotten a bad review for not participating.

¶ 20   Corley testified that the basketball program was started to allow sixth, seventh, and eighth grade students to play basketball in the gymnasium after school as a reward for good behavior and good grades.  He stated that he and another teacher, Anthony Marinello, had first discussed the idea of the basketball program and proposed it to Levy, who had granted permission for them to allow students to come in after school to play basketball.  He testified that there were never more than 15 to 20 students participating in a game and that not all of them were playing at the same time.  He stated that he and Marinello had supervised the students after school for approximately three weeks before the claimant's injury.  They were not compensated for doing so.  He testified that, at some point in time, they decided that they would get a couple of teachers, whoever wanted to participate, to play against the students as part of the afterschool basketball program.

¶ 21   Corley testified that the students' parents were not required to be present while they were participating in the afterschool basketball program; nor did the school hire any outside personnel to provide oversight to the students during the program.  He stated that, although he and Marinello were volunteering their time to supervise the program, if anything had happened while the students were participating in the program, he and Marinello would have been responsible for addressing the issues.  For example, if a fire alarm had gone off, they would have been responsible for ensuring that proper evacuation procedures were followed; if there had been a lock-down situation, they would have been responsible for following proper lock-down procedures; if there had been a fight between students, they would have been responsible for breaking up the fight and submitting the

necessary reports to the administration; and if a student had been injured, they would have been responsible for taking necessary measures to address the injury.

¶ 22   Corley later acknowledged that, during the student/teacher game in which the claimant was injured, all of the teachers present would have been equally responsible for overseeing the welfare of the students.  He also acknowledged that just because the teachers were there after school and were not getting paid for it did not mean that they were absolved of their responsibilities as teachers during that period of time.

¶ 23   Corley testified that they did not allow student spectators during the games because they did not want to be responsible.  He stated that the only students who would have been watching the game were the ones who were not playing at that particular time.

¶ 24   On January 3, 2014, the arbitrator filed her decision, awarding the claimant benefits under the Act.  The arbitrator found that the claimant was not engaged in a "voluntary recreational program" under section 11 of the Act at the time of his injury and that his injury arose out of and in the course of his employment.  The arbitrator stated:

> "[The claimant] testified that during his first year contracted as a teacher with [the employer] he was asked on three separate occasions by the principal, Mr. Levy, to play in student-teacher basketball games.  [The claimant] explained that all teachers were expected to attend events, open houses, performances, and other after-school functions without pay and that he considered these expectations to be a part of his job duties.  Indeed, both [the claimant] and Mr. Corley testified that they were responsible for students' well-being during basketball games and that they were not relieved of their responsibilities as teachers during these games

where other student spectators were not allowed and no parents or guardians of the 6th, 7th and 8th grade students participating were required to attend. Moreover, both [the claimant] and Mr. Corley testified that the basketball games were designed to reward students [who] were performing well in school. Mr. Levy did not testify at [the hearing,] and [the claimant's] testimony about his job duties and conversations with Mr. Levy remain uncontroverted. Moreover, after careful observation of [the claimant] at [the hearing] and considering [the claimant's] testimony in light of the documentary evidence and the testimony of Mr. Corley, the Arbitrator finds [the claimant's] testimony to be credible and corroborated by the record.

Thus, *** the evidence in this case establishes that [the claimant] participated in the basketball game on March 23, 2011[,] upon Mr. Levy's third request to do so because he reasonably believed that his job duties required him to do so and because he wanted to avoid unfavorable action by Mr. Levy given that he expected to receive his first performance review and a contract for the upcoming school year by the end of that month. Based on all of the foregoing, the Arbitrator finds that [the claimant] has established through credible evidence that his injury on March 23, 2011[,] arose out of and in the course of his employment for [the employer] and that he was not engaged in a voluntary recreational activity as defined in Section 11 of the Act at the time of his injury."

¶ 25    The arbitrator further found that, in the year preceding the injury, the claimant earned $27,194.20 and that his average weekly wage was $881.29. The arbitrator

awarded him temporary total disability benefits of $587.53 per week for 2 5/7 weeks, for the period from March 24 through April 11, 2011, noting that, on April 11, he had been released to light duty work, which the employer had accommodated. The arbitrator awarded him permanent partial disability benefits of $528.77 per week for 50.6 weeks based on the arbitrator's finding that he had established permanent partial disability to the extent of 20% loss of use of the left arm.

¶ 26    The employer sought review of the arbitrator's decision before the Commission. On March 23, 2015, the Commission entered its decision, affirming and adopting the arbitrator's decision.

¶ 27    The employer filed a timely petition for judicial review in the circuit court. On September 25, 2015, the court entered its order, reversing the Commission's decision. The court found that the claimant was participating in a "voluntary recreational program" under section 11 of the Act at the time of his injury and that his injury, therefore, did not arise out of and in the course of his employment. The claimant appeals.

¶ 28                                    ANALYSIS

¶ 29    To recover benefits under the Act, the claimant bears the burden of proving, by a preponderance of the evidence, that he has suffered a disabling injury that arose out of and in the course of his employment. 820 ILCS 305/2 (West 2010). "In the course of employment" refers to the time, place, and circumstances surrounding the injury, and the "arising out of" component is primarily concerned with causal connection. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671-72 (2003). To satisfy the "arising out of" component, the claimant must show "that the injury had its origin in some

risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id.* at 203, 797 N.E.2d at 672. Typically, an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts that he was instructed to perform by his employer, acts that he had a common law or statutory duty to perform, or acts that he might reasonably be expected to perform incident to his assigned duties. *Id.* at 204, 797 N.E.2d at 672. A risk is incidental to the employment if it belongs to, or is connected with, what an employee has to do in performing his duties. *Id.*

¶ 30    Under section 11 of the Act, "[a]ccidental injuries incurred while participating in voluntary recreational programs including but not limited to athletic events, parties and picnics do not arise out of and in the course of the employment even though the employer pays some or all of the cost thereof." 820 ILCS 305/11 (West 2010). However, "[t]his exclusion shall not apply in the event that the injured employee was ordered or assigned by his employer to participate in the program." *Id.*

¶ 31    Here, the Commission found that the claimant was not engaged in a "voluntary recreational program" under section 11 of the Act at the time of his injury and that his injury arose out of and in the course of his employment. The claimant argues that the circuit court erred in reversing the Commission's decision because his participation in the student/teacher basketball game was neither "recreational" nor "voluntary."

¶ 32    The interpretation of a statute is a question of law subject to *de novo* review. *Elmhurst Park District v. Illinois Workers' Compensation Comm'n*, 395 Ill. App. 3d 404, 408, 917 N.E.2d 1052, 1056 (2009). However, whether, under the facts of a particular

case, an activity is a "voluntary recreational program" under section 11 of the Act and whether the claimant's injuries arose out of his employment are questions of fact for the Commission. *Pickett v. Industrial Comm'n*, 252 Ill. App. 3d 355, 357, 625 N.E.2d 69, 71 (1993); *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 164, 731 N.E.2d 795, 808 (2000). The Commission's determinations on these matters will not be disturbed on review unless they are against the manifest weight of the evidence. *Pickett*, 252 Ill. App. 3d at 360, 625 N.E.2d at 73; *Illinois Institute of Technology Research Institute*, 314 Ill. App. 3d at 164, 731 N.E.2d at 808.

¶ 33 Although section 11 of the Act provides several general examples of activities that may be considered "recreational programs," including "athletic events, parties and picnics," the Act does not define "recreational programs." 820 ILCS 305/11 (West 2010); *Elmhurst Park District*, 395 Ill. App. 3d at 408-09, 917 N.E.2d at 1056.

¶ 34 In *Elmhurst Park District*, we interpreted section 11's use of "recreational" using the plain and ordinary meaning of the derivative "recreation." *Id.* at 409, 917 N.E.2d at 1056-57. We noted that "recreation" is defined as " 'the act of recreating or the state of being recreated: refreshment of the strength and spirits after toil: DIVERSION, PLAY.' " *Id.* at 409, 917 N.E.2d at 1057 (quoting Webster's Third New International Dictionary 1899 (2002)). We continued as follows:

"Given the foregoing definition, we can certainly envision circumstances under which participation in a game of wallyball would constitute a 'recreational' activity and therefore fall within the voluntary-recreational activity exclusion set forth in section 11 of the Act. However, we do not believe that the facts of this

case present such a situation. Similar to a professional athlete, 'recreation' is inherent in claimant's position as a fitness supervisor. [Citation.] As such, we find it appropriate to consider why claimant agreed to play wallyball on the date he was injured. The evidence adduced at the arbitration hearing established that claimant initially declined [a coworker's] invitation to participate in the wallyball game because he was not feeling well and he had other work to do. However, [the coworker] persisted in her request and told claimant that absent his participation, the game would be cancelled because there would not be enough participants. Thereafter, claimant decided to 'help[] out' because he 'felt that [it] was part of [his] job' which was 'to promote *** different classes and programs.' Based on this evidence, we conclude that claimant did not participate in the wallyball game for his own 'diversion' or to 'refresh' or 'strengthen' his spirits after toil. Rather, claimant participated in the game to accommodate respondent's customers. As such, we find that claimant was not engaged in a 'recreational' activity as contemplated by section 11 of the Act at the time of his injury." *Id.*

¶ 35 Similarly, here, we can certainly envision circumstances under which participation in a basketball game would constitute a "recreational" activity and, therefore, fall within the voluntary-recreational activity exclusion set forth in section 11 of the Act. However, we do not believe that the facts of this case present such a situation. The evidence presented at the arbitration hearing established that the claimant was not a basketball player and did not want to participate in the student/teacher basketball games. He repeatedly tried to avoid having to participate in the games. Had his principal not

repeatedly pressured him to participate in the games, he would not have done so of his own accord. He testified that his performance review was imminent; that he had not yet been offered a position for the next school year; and that he was concerned that if he again declined to participate, it might reflect badly in his performance review, and he might not be offered a position for the next school year. Moreover, he testified that he considered attendance and participation in after-school events involving the students to be a part of his job as a teacher. This evidence is sufficient to support a finding that the claimant did not participate in the basketball game for his own "diversion" or to "refresh" or "strengthen" his spirits after toil and that he, therefore, was not engaged in a "recreational" activity under section 11 of the Act at the time of his injury. Thus, the Commission's finding that the claimant was not engaged in a "voluntary recreational program" under section 11 of the Act at the time of his injury is not against the manifest weight of the evidence.

¶ 36    The claimant also argues that the Commission erred in calculating his average weekly wage under section 10 of the Act (820 ILCS 305/10 (West 2010)). The employer argues that the claimant has forfeited his argument regarding the calculation of his average weekly wage because, *inter alia*, he did not raise the issue in his notice of appeal.

¶ 37    The filing of a notice of appeal is the jurisdictional step that initiates appellate review. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176, 950 N.E.2d 1136, 1143 (2011). "Unless there is a properly filed notice of appeal, the appellate court lacks jurisdiction over the matter and is obliged to dismiss the appeal." *Id.* at 176, 950 N.E.2d at 1144.

¶ 38 Supreme Court Rule 303(b)(2) (eff. Jan. 1, 2015) requires that a notice of appeal "specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." "A notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal." *General Motors Corp.*, 242 Ill. 2d at 176, 950 N.E.2d at 1144.

¶ 39 The purpose of the notice of appeal is to notify the prevailing party that the other party seeks review of the circuit court's decision. *Id.* The notice of appeal is to be considered as a whole and will be found sufficient to confer jurisdiction on a reviewing court when it fairly and adequately sets out the judgment complained of and the relief sought, thus informing the prevailing party of the nature of the appeal. *Id.* Therefore, if the deficiency in notice is one of form, and not substance, and the appellee is not prejudiced, failure to strictly comply with the form of notice is not fatal. *Id.*

¶ 40 Here, the claimant's notice of appeal provides, in pertinent part, as follows:

"Please take notice that following the entry of final judgment by the Circuit Court of [] Cook County, Illinois, the [claimant], Jonathan Jordan, hereby appeals to the Illinois Appellate Court, First Appellate District, Workers' Compensation Division, from the following order and judgment entered in this case by the Circuit Court:

1) The September 25, 2015[,] order reversing the Award of the Illinois Workers' Compensation Commission and finding that the [claimant] was not within the scope of his employment when he was injured on March 23, 2011.

15

The [claimant], Jonathan Jordan, respectfully requests that the Appellate Court reverse the September 25, 2015[,] order reversing the Award of the Workers' Compensation Commission; remand this matter to the trial court for further proceedings consistent with its opinion; and grant any other and further relief that the Appellate Court deems just and proper under the circumstances."

¶ 41 In his notice of appeal, the claimant asked that we reverse the circuit court's order reversing the Commission's decision and remand this matter to the circuit court for further proceedings. The claimant did not ask that we review the propriety of the Commission's calculation of his average weekly wage. In his reply brief, the claimant asked for leave to amend his notice of appeal to add the average weekly wage issue.

¶ 42 Supreme Court Rule 303 (eff. Jan. 1, 2015) requires that the notice of appeal be filed within 30 days of the entry of a final judgment of the circuit court. Supreme Court Rule 303(b)(5) and (d) (eff. Jan. 1, 2015) provides an additional 30 days after expiration of the original 30-day filing period to file an amended notice of appeal. After expiration of the additional 30-day safety-valve period, however, we lack jurisdiction to permit amendment of the notice of appeal. *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 688, 637 N.E.2d 1085, 1090 (1994).

¶ 43 Here, the claimant did not raise the average weekly wage issue in his notice of appeal; the time for filing an amended notice of appeal has long since expired; and we, therefore, lack jurisdiction to permit amendment of the notice of appeal. In addition, the deficiency in notice in this case is one of substance, and not form. We, therefore, lack jurisdiction to address the average weekly wage issue.

¶ 44                              CONCLUSION

¶ 45    For the foregoing reasons, we reverse the judgment of the circuit court and reinstate the Commission's decision.

¶ 46    Circuit court's judgment reversed; Commission's decision reinstated.