# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Ruvola*, 2017 IL App (2d) 160737

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LEONARD A. RUVOLA, Petitioner-Appellant, and MICHELLE RUVOLA, Respondent-Appellee. |
| District & No. | Second District<br>Docket No. 2-16-0737 |
| Filed<br>Rehearing denied | June 27, 2017<br>August 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-D-943; the Hon. Timothy J. McJoynt, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Cause remanded. |
| Counsel on Appeal | Richard D. Felice, of Law Offices of Richard D. Felice P.C., of Wheaton, for appellant.<br><br>Michelle E. Dahlquist, of Nigohosian & Dahlquist, P.C., of Wheaton, for appellee. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1      Petitioner, Leonard A. Ruvola, raises various challenges to the trial court's judgment dissolving his marriage to respondent, Michelle Ruvola. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

¶ 2      I. BACKGROUND

¶ 3      We begin with a brief overview of the proceedings below. We provide additional background as we discuss each issue on appeal.

¶ 4      The parties were married in 1989. Their two children were adults when petitioner filed for divorce in March 2014. Having had sporadic employment since 1998, petitioner requested permanent maintenance from respondent. As was brought out at trial, petitioner attempted suicide in 2009 and later underwent psychiatric treatment. In July 2015, the parties stipulated, for purposes of trial, that petitioner "is not disabled" and "is not unemployable but is capable of employment." On September 22, 2015, the trial court entered an order stating:

> "[Petitioner] shall seek full time employment. He shall apply for 7 jobs per week.* Petitioner shall tender copies of his applications, any responses, and a copy of the job search diary on a weekly basis, commencing on October 9, 2015 and continuing on a weekly basis. *At least 2 applications shall be in person."

¶ 5      In October 2015, respondent filed a petition for a rule to show cause and for an adjudication of indirect civil contempt. Respondent alleged that petitioner violated the September 2015 job-search order by failing to submit documents related to his job search. Respondent also alleged that petitioner was still unemployed. The trial court continued the contempt petition until the trial on the dissolution petition.

¶ 6      The trial court held a trial in December 2015. In its March 2016 judgment of dissolution, the court awarded petitioner permanent maintenance. The court found that respondent's yearly income was $125,000. Applying the statutory formula to respondent's income (see 750 ILCS 5/504(b-1) (West 2016)), the court reached a provisional maintenance amount of $3125 per month. The court then deviated downward from this figure on three bases. First, the court imputed income to petitioner in the amount of $25,000 per year, because of his "lack of effort *** in obtaining employment and his voluntary underemployment." Second, the court cited petitioner's "ability to meet his own expenses since [the parties'] separation." Third, the court "consider[ed] the property to be awarded to the Petitioner." These adjustments reduced the maintenance award to $2400 per month.

¶ 7      Addressing respondent's contempt petition, the trial court both issued a rule to show cause and adjudicated petitioner in indirect civil contempt of court for his "failure to comply with the [September 2015] job search order." The court set purge conditions and awarded respondent $2000 in attorney fees connected with her contempt petition.

¶ 8      Petitioner filed a motion to reconsider, which the trial court denied. He then filed this timely appeal.

¶ 9                                            II. ANALYSIS
¶ 10                                           A. Maintenance
¶ 11                                      1. Respondent's Income

¶ 12        Petitioner contends that the trial court failed to consider all sources of respondent's income in calculating maintenance. We agree.

¶ 13        We note, first, that the trial court was correct to apply the amendments to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2016)) that became effective on January 1, 2016. See Pub. Act 99-90 (eff. Jan. 1, 2016) (amending 750 ILCS 5/101 *et seq.*). The amendments became effective after the closing of proofs in this case but before the judgment was rendered. See 750 ILCS 5/801(b) (West 2016) ("This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to issues on which a judgment has not been entered.").

¶ 14        At trial, respondent testified that she has been employed with The Standard Companies (Standard) since 1984. She is "unofficially" vice-president of the company. The company is owned by her mother, and her father is chief executive officer and chairman. Respondent testified that her current salary at Standard is $121,200 per year, which is paid to her in two checks per month of $5050 each. Respondent also receives a weekly check from Standard for $255. These disbursements are reflected in internal documentation from Standard that was introduced into evidence. According to respondent, the $255 weekly checks, which amount to $13,260 per year, are not salary but are "gifts" from her father. Respondent testified that her father gave her regular monetary gifts prior to her employment with Standard and that her siblings also currently receive regular monetary gifts from him. Respondent testified that her yearly base income, combining both the salary and the gift checks, is $134,460. Respondent noted that Standard also pays her discretionary bonuses. In 2014, she received a $2000 bonus.

¶ 15        The record contains the parties' filed tax returns for 2010 through 2013 and their unfiled tax return for 2014. Also in the record are respondent's W-2 forms from Standard for 2012 through 2014. These W-2 forms show "Medicare wages" to respondent of $128,254.74 in 2014, $128,203.64 in 2013, and $127,640.43 in 2012. The record contains no W-2 forms for 2010 and 2011, but the tax returns for those years report "wages, salaries, tips etc." of $119,424 in 2010 and $123,260 in 2011. Asked about the discrepancy between the $134,460 that she receives yearly from Standard and the amounts shown on her W-2 forms and tax returns, respondent acknowledged that her $255 gift checks are "maybe" not reported as income.

¶ 16        Respondent testified that Standard provides her with various fringe benefits, such as a car, a cell phone, a home fax line, and home Internet service.

¶ 17        The trial court, addressing petitioner's maintenance request, recalled respondent as testifying that her "income is $121,000.00 per year gross which includes an additional 'stipend' of $255.00 per week." The court observed that the tax documents at trial showed that respondent "has been paid a base salary of $125,000.00 per year for tax years 2010, 2011, and 2012" and that her income for 2014 was $128,000. The court noted that it was considering the various fringe benefits respondent received from Standard as "direct or indirect income" in computing her yearly gross income for maintenance purposes. The court ultimately found that respondent's gross income per year is $125,000. Using the guidelines provided in section

504(b-1)(1) of the Act (750 ILCS 5/504(b-1)(1) (West 2016)), the trial court computed a provisional amount of maintenance from which it then deviated downward.

¶ 18    We agree with petitioner that the trial court erred by failing to include, in its determination of respondent's yearly gross income, the weekly gift checks that she receives from her father. "Gross income" for purposes of a guideline award of maintenance "means all income from all sources, within the scope of that phrase in Section 505 of [the] Act [(750 ILCS 5/505 (West 2016))]." 750 ILCS 5/504(b-3) (West 2016). Section 505 of the Act (750 ILCS 5/505 (West 2016)) governs awards of child support. Section 505(a)(3) of the Act (750 ILCS 5/505(a)(3) (West 2016)) defines " '[n]et income' *** as the total of all income from all sources, minus [specified] deductions." Whether an item constitutes income for purposes of child support is a question of law, which we review *de novo*. *In re Marriage of Shores*, 2014 IL App (2d) 130151, ¶ 24. By extension, the *de novo* standard also applies to whether an item constitutes income for purposes of maintenance.

¶ 19    Fortunately, there is clear authority on whether gifts received by the payor spouse constitute income for purposes of child support. In *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004), the supreme court held that the annual gifts that the payor spouse received from his father constituted "income" under section 505(a)(3). In compliance with the legislature's directive in section 504(b-3), we hold that gifts received by the payor spouse also constitute income for purposes of maintenance.

¶ 20    In this case, the trial court appeared to believe that the yearly base amount that respondent claimed to receive from Standard is only $121,000 and that this amount includes the weekly gift checks. In fact, respondent testified that she receives the gift checks *in addition to* her base salary of $121,200 per year. The figure that the trial court found, $125,000, was perhaps a compromise between the yearly base amount as the trial court (mis)understood it and the income shown on the tax documents, which ranged to as high as $128,000 for 2014. However, by any estimate of respondent's salary from Standard, the $125,000 figure was too low as a total of respondent's income, given her testimony that she receives $13,260 in gifts each year from her father. Accordingly, we conclude that the trial court failed to include these gifts in its determination of respondent's income.

¶ 21    We note that petitioner assigns further error to the trial court with respect to a fringe benefit that respondent regularly receives from Standard. Petitioner asserts that respondent "paid herself $300 a month out of her joint checking account which was the amount of phone [and] Internet bill which is already covered by [Standard]." Petitioner asks that we therefore attribute $300 of additional monthly income to respondent. Petitioner is referring to the monthly amount (actually $350, not $300) that respondent provides herself as a personal allowance. We are not sure what relevance the allowance has to whether the trial court failed to consider as income to respondent the "phone [and] Internet" service covered by Standard. In any event, the court said that it was considering fringe benefits to respondent in determining her income. Petitioner has not established that the court did not consider those benefits. In particular, he fails to justify his figure of $300. Respondent never testified to any correlation between her monthly allowance and the cost of the "phone [and] Internet" service (we wonder why there would be such a correlation). Petitioner cites no other figure in the record to support his claim that the court should have included an additional $300 as income to respondent. Accordingly, we reject his claim that the court failed to consider Standard's payment for "phone [and] Internet" service as income to respondent.

¶ 22 For the foregoing reasons, we vacate the trial court's finding as to respondent's income. We remand for the court to recalculate maintenance after including, as income to respondent, the weekly gift checks from her father.

¶ 23                                    2. Imputation of Income to Petitioner

¶ 24 Petitioner also claims that the trial court wrongly imputed income to him. We disagree.

¶ 25 Petitioner testified that he graduated from college in 1981 with a degree in chemistry. That same year, he began full-time employment with Ezem in New York. He started at Ezem as an analytical chemist but was promoted to other positions, including research assistant, assistant to the vice-president, and production supervisor. In 1986, he left Ezem for a better opportunity with Hallcrest in Illinois. He began in the lab at Hallcrest but was promoted to lab manager, production manager, and, finally, vice-president of operations. When he left Hallcrest in 1998, his annual salary was $125,000. Petitioner explained that he left Hallcrest in order to start his own business. Respondent did not agree with his decision to leave. After about a year of unsuccessfully looking for a business to start or purchase, petitioner began looking for work. He applied for "higher level" or "substantive" positions, such as vice-president of operations or plant manager. He was a finalist for six such positions but was not hired. He was told at these interviews that he had good qualities. Petitioner believed that these positions were offered to applicants who had experience that petitioner lacked. Petitioner also applied for mid-level positions but not for entry-level positions. After this unsuccessful job search, petitioner obtained work in 2000 as a tennis instructor for the Glenview park district. The number of hours he worked varied greatly, from 12 to 45 per week. He continued "on and off" in this position until 2009. W-2 forms from the Glenview park district for 2001, 2002, 2003, 2006, 2008, and 2009 show earnings ranging from $225 to $9000 per year.

¶ 26 According to petitioner, his first full-time position after Hallcrest was as an insurance agent for State Farm. He worked at State Farm for several months in 2004 and earned $29,000. He left voluntarily because State Farm's commission structure became less favorable for agents.

¶ 27 Petitioner testified that, in December 2009, he was severely depressed and attempted suicide by ingesting pills. Respondent objected to this testimony on the ground that it violated the terms of the July 2015 stipulation that petitioner is not disabled and is able to work. The trial court overruled the objection.

¶ 28 After his suicide attempt, petitioner spent several days in a psychiatric ward. Upon his discharge, he underwent a 30-day outpatient program and was placed on medication. Following that program, he had weekly appointments with a psychologist and monthly appointments with a psychiatrist.

¶ 29 Petitioner testified that he did not work in 2010 because he was still recovering from the 2009 incident. Petitioner believed that he did not work in 2011 either. Petitioner did not explain why. In 2012, he was employed at the Oak Brook park district. He worked initially in the fitness center, cleaning equipment and towels. Eventually, he was promoted to tennis instructor. His earnings at the park district were $19,000 in 2012 and $14,000 in 2013. He left the park district at the end of 2013, following the unsatisfactory resolution of his complaint to human resources that his immediate supervisor was treating subordinates unfairly.

¶ 30 Petitioner's resume was introduced into evidence. He was asked about an entry that stated, "Part Time Associate—GolfTec—12/13-12/14," and listed "Kevin DeBesten" as a reference.

Petitioner explained that he answered phones at GolfTec as a favor to DeBesten but never was actually employed there or received payment.

¶ 31 Petitioner stated that, in November 2014, he underwent a 30-day outpatient program for anxiety and depression. Respondent corroborated this in her testimony. She explained that, after noting some alarming behavior in petitioner, she notified his psychiatrist, which led to petitioner's placement in the treatment program. Petitioner testified that he neither worked nor looked for work in 2014, even before his treatment. He did not explain why.

¶ 32 Petitioner testified that, in December 2014, he traveled to Florida. Over the next few months, petitioner traveled about, staying with family and friends in several locations. For the first few months of 2015, he did not look for work because "[i]t's difficult living out of a car." Petitioner became a permanent Florida resident in June 2015 when he moved to Jupiter. He currently lives in Jupiter with his cousin's son.

¶ 33 Petitioner acknowledged that his resume states that he was a part-time sales associate at two State Farm agencies from January 2015 to the present. Petitioner noted that the references listed for the State Farm jobs are family members. Petitioner denied that he was employed by, worked for, or received payment from State Farm in 2015.

¶ 34 Petitioner's job-search diary was introduced into evidence. The diary chronicles petitioner's employment search since he moved to Jupiter. The first part of the diary describes petitioner's contacts with friends and family and his pursuit of potential job leads. The only lead actually described, however, is a position at a fitness club greeting guests, handing out towels, and cleaning equipment. Petitioner notes no success in pursuing any leads. The second part of the diary describes petitioner's canvass of a strip mall in September 2015. Petitioner writes that he went from store to store, handing out his business card (eventually he was hired by Sal's Pizzeria, as we describe below). Petitioner also documents separate job inquiries he made to a Harley Davidson dealer and the Jupiter police department. A copy of petitioner's business card was introduced into evidence. The card describes him as a "Recently Relocated Semi-Retiree" seeking a position in "Live Customer Service." Petitioner believed that "somebody might" be interested in hiring him even though he described himself as semi-retired.

¶ 35 The third part of the job-search diary describes petitioner's hiring by Sal's Pizzeria in Jupiter. Petitioner testified that he frequented Sal's after he moved to Jupiter in June 2015. That same month, he inquired if Sal's had any job openings (later in his testimony, however, petitioner stated that he did not inquire of Sal's until September 2015). Sal's said they would have no need for him until November 2015. Petitioner remained unemployed until, on October 14, 2015, he worked his first kitchen shift at Sal's. He was complimented on his work, but when Sal's contacted him a few days later, they offered him a delivery position instead. He turned down the offer because he was new to the area and had an SUV, which would "guzzle" the gas. Two weeks later, Sal's offered him kitchen work. Petitioner subsequently worked several shifts at Sal's but had to miss several other shifts because of this proceeding. Petitioner's work at Sal's involves "chopping stuff and making salads" and "not any real cooking." His wage is $8.25 per hour, but because of a mix-up, he has yet to receive payment. He believes that a check is waiting for him in Florida. Sal's has opportunities for full-time work, but because petitioner has not worked there for two months, he doubts that he is still employed.

¶ 36     Petitioner was asked about his compliance with the September 2015 order directing him to seek full-time employment and tender copies of job applications that he has submitted to employers. Petitioner admitted that he has not tendered copies of job applications as ordered. He did "online searches" for jobs but produced no documentation of them. Petitioner admitted that the inquiries to Harley Davidson and the Jupiter police department were the only job inquiries he made since the September 2015 order.

¶ 37     Petitioner testified that he currently takes medication for anxiety and depression and attends regular therapy sessions. However, he considers himself capable of work and intends to seek a job when he returns to Florida. Petitioner claimed that he would be a "very hard sell" for a position in the chemistry field, given his age (56) and the passage of time since his employment at Hallcrest (he left in 1998), which was his most recent job in the field. He admitted that he has not sought another job in the chemistry field since leaving Hallcrest. He has also not sought to renew his insurance license, which he let expire after leaving State Farm in 2004. Petitioner testified that his ideal job would be to "work in Orlando for one of the parks."

¶ 38     The trial court found that petitioner displayed a "lack of effort *** in obtaining employment" and is "voluntar[ily] underemployed." The court noted that "much of [petitioner's job-search diary] appears to be attempts to obtain part time work in the food industry—with no connection to the Petitioner's experience or education." Referencing petitioner's self-designation on his business card as semi-retired, the court asked, "What employer would want to hire such an applicant for full time gainful employment under those conditions?" The court noted that, despite petitioner's attempted suicide and subsequent psychiatric treatment, he "appears to be healthy and able to sustain employment." The court imputed to petitioner yearly income of $25,000.

¶ 39     Section 504(b-2)(2) of the Act (750 ILCS 5/504(b-2)(2) (West 2016)) authorizes the trial court to deviate from the guideline amount of maintenance. One of the factors relevant to a deviation is the respective earning capacities of the parties. 750 ILCS 5/504(a)(3) (West 2016). "In order to impute income to a party, the court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 44. Imputation is appropriate in cases of voluntary unemployment or voluntary *under*employment. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶¶ 29-31 (where husband voluntarily quit farming, by which he had in recent years supplemented his income as a farmhand, it was appropriate to impute farming income to him for purposes of maintenance). The trial court's decision whether to impute income is reviewed for an abuse of discretion. *Id.* ¶ 30. A court abuses its discretion only where no reasonable person would take the view adopted by the court. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 52.

¶ 40     Petitioner claims that his efforts at seeking employment were sincere and that his failure to find employment more lucrative than his most recent work in a pizzeria is attributable to "numerous barriers" he faces in finding work. The trial court disagreed, and the evidence supports its determination.

¶ 41     The trial court supported its finding of voluntary underemployment by noting, with criticism, that petitioner's recent employment search (chronicled in his job-search diary) did not reflect a pursuit of any opportunity within petitioner's field of training, chemistry. In fact, petitioner admitted that he has not looked for a position within that field since leaving Hallcrest

in 1998. Despite this evidence, the income that the trial court imputed to petitioner ($25,000 yearly) was obviously more in line with his recent earnings as a tennis instructor ($19,000 in 2012) than with his earnings at Hallcrest ($125,000 at their highest). The trial court did not explain why; the most plausible explanation is that the court felt that it lacked up-to-date salary information for positions within the chemistry field. Notably, there would have been no inconsistency between the court's finding that petitioner is voluntarily unemployed in the field of chemistry and its imputation of income commensurate with petitioner's recent positions outside the field because the court lacked reliable salary data for the field.

¶ 42    The court was indeed justified in finding that petitioner is voluntarily underemployed because of his failure to seek a position within his field of training. The court so found despite petitioner's claim that he lacks marketability for positions in chemistry because he is 56 years old and is many years removed from the field. Petitioner produced no support for this claim—not even failed attempts to find a job within the field, as by his own admission he made no such attempt since leaving Hallcrest in 1998.

¶ 43    The trial court, however, evidently believing that even employment outside petitioner's field of training is preferable to no work at all, also criticized petitioner's attempts to find work outside that field. The court specifically commented that petitioner's business card describing him as semi-retired undermined his job prospects. We agree that the designation is not helpful however it is construed. Was petitioner semi-retired from his career job and available only on a limited basis for other employment, or was he semi-retired from work altogether and thus available only on a limited basis? In either case, prospective employers would likely see petitioner as not available for full-time work.

¶ 44    Petitioner's lack of earnestness was also displayed in the scope of his job search. Petitioner maintained his job-search diary since June 2015, but it shows only his pursuit of a handful of job leads from family and friends, his cold-call canvassing of a strip mall in September 2015, and two subsequent cold calls to Harley Davidson and the Jupiter police department. Petitioner also claimed to have made online job searches, but he submitted no documentation of them. Petitioner admitted that the cold calls to Harley Davidson and the police department were his only job inquiries following the September 2015 job-search order. The sparseness of petitioner's efforts was remarkable, given that he was under court order to persistently seek full-time employment. Also significant are prior periods of unemployment (for instance, 2011 and most of 2014) for which petitioner offered no explanation.

¶ 45    Petitioner now claims, however, that his mental-health issues have impaired his employment search since his 2009 suicide attempt. He also submits that he can make this claim of impairment without contradicting the parties' trial stipulation that he "is not disabled" and "is not unemployable but is capable of employment." Petitioner says:

> "The evidence shows that [petitioner] was suffering from depression and anxiety, had attempted suicide following which he was treated inpatient and then outpatient under the care of a psychiatrist and a therapist. *** [T]he trial court overemphasized [the stipulation] in its findings. The fact that [petitioner] is not *disabled* because of his psychiatric issues does not necessarily mean that they are not *contributory* to his failure to find employment. *** [A]lthough not disabled, he still suffers from conditions that affect his social skills and interactions while seeking employment." (Emphases in original.)

Petitioner presses the distinction in vain because he offered simply no evidence that his conditions have had a negative impact on his job search. In his testimony, petitioner described his job-search efforts, claimed that he was still capable of employment, and affirmed that he intends to look for work when he returns to Florida. He never intimated that his mental health adversely affects his ability to search for employment.

¶ 46 Given the evidence that petitioner is voluntarily unemployed or underemployed, the trial court did not abuse its discretion in imputing income to him. We note that petitioner does not dispute the actual amount of income imputed.

¶ 47 B. Finding of Indirect Civil Contempt

¶ 48 Petitioner challenges the finding of indirect civil contempt for his failure to comply with the September 2015 job-search order. The finding was entered as part of the trial court's March 2015 dissolution judgment. Respondent claims that we have no jurisdiction over the contempt finding because petitioner did not specify it in his notice of appeal. We agree that we lack jurisdiction to review that finding.

¶ 49 The notice of appeal states:

"Petitioner-Appellant *** appeals to the Appellate Court of Illinois, Second District, the following order entered in this matter in the Circuit Court of Du Page County:

The order of August 8, 2016, which denied his Motion to Reconsider the Judgment of Dissolution of Marriage in the above-captioned case and the entry of said judgment.

By this appeal, Petitioner-Appellant will ask the Appellate Court to reverse the order of August 8, 2016 and Judgment thereon and to enter Judgment on appeal in his favor awarding him maintenance in the amount of $40,000 per year, reversing the finding and award of dissipation against him, and awarding him one half of the marital estate reflecting his contributions thereto."

¶ 50 Illinois Supreme Court Rule 303(b)(2) (eff. Jan. 1, 2015) provides that a notice of appeal "shall specify the judgment or part thereof and other orders appealed from and the relief sought from the reviewing court." "The filing of a notice of appeal is the jurisdictional step which initiates appellate review." (Internal quotation marks omitted.) *People v. Smith*, 228 Ill. 2d 95, 104 (2008). The supreme court in *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434-35 (1979), provided the following guidelines for construing the jurisdictional reach of a notice of appeal:

"When an appeal is taken from a specified judgment only, or from a part of a specified judgment, the court of review acquires no jurisdiction to review other judgments or parts thereof not so specified or not fairly to be inferred from the notice as intended to be presented for review on the appeal. If from the notice of appeal itself and the subsequent proceedings it appears that the appeal was intended, and the appellant and the appellee so understood, to have been taken from an unspecified judgment or part thereof, the notice of appeal may be construed as bringing up for review the unspecified part of the order or judgment. Such a construction would be appropriate where the specified order directly relates back to the judgment or order sought to be reviewed. *** [T]he unspecified judgment is reviewable if it is a step in the procedural

progression leading to the judgment specified in the notice of appeal. [Citation.]" (Internal quotation marks omitted.)

The court admonished against a hypertechnical construction of a notice of appeal:

"[A] notice of appeal is to be liberally construed. The notice of appeal serves the purpose of informing the prevailing party in the trial court that the unsuccessful litigant seeks a review by a higher court. Briefs, and not the notice of appeal itself, specify the precise points to be relied upon for reversal. *** [A] notice of appeal will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal. [Citations.] Unless the appellee is prejudiced thereby, the absence of strict technical compliance with the form of the notice is not fatal, and where the deficiency in the notice is one of form only, and not of substance, the appellate court is not deprived of jurisdiction. [Citations.]" *Id.* at 433-34.

¶ 51    Typically, the designation of a judgment resolving a motion to reconsider is held to confer jurisdiction also of the judgment of which reconsideration was sought. The rationale is that the original judgment is in the procedural progression leading to the judgment resolving the motion to reconsider. See *Schmidt v. Joseph*, 315 Ill. App. 3d 77, 80 (2000); *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 689 (1994). Accordingly, the basis of respondent's challenge is not that petitioner identified the August 8, 2016, order denying his motion to reconsider without also identifying the underlying dissolution judgment.

¶ 52    The defect that respondent alleges, rather, is that the notice of appeal challenges certain aspects of the dissolution judgment without mentioning the contempt finding. Specifically, the notice seeks reversal of the dissipation finding against petitioner and modification of both the maintenance award and the distribution of marital property. It cannot be "fairly *** inferred" (*Burtell*, 76 Ill. 2d at 434) from the notice of appeal that petitioner also intended to challenge the contempt finding, which was independent of the rulings on dissipation, maintenance, and property distribution. The contempt finding was governed by different legal standards, and though the imputation aspect of the maintenance ruling had some factual commonality with the contempt finding, the latter was based on the narrower issue of whether petitioner complied with the court's September 2015 job-search order. See *Calumet School District No. 132 v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 153034WC, ¶¶ 40-43 (where notice of appeal specified only one aspect of the Commission's judgment, namely its determination on scope of employment, jurisdiction did not extend to wage determination made in that same judgment).

¶ 53    Nor can we deem the defect as one of form alone. The notice expresses an intent to focus on certain substantive issues governed by the Act and raised in the dissolution petition and related filings; to read the notice as extending to a collateral issue in the action would be not to overlook a technical failing but to substantively rewrite the notice.

¶ 54    Petitioner observes that respondent has not claimed that she was prejudiced by his failure to specify the contempt finding. Prejudice becomes arguable, however, only where the defect at issue is one of form alone. "[A] failure to comply strictly with the form of notice is not fatal if the deficiency is one of form rather than substance *and* the appellee is not prejudiced." (Emphasis added.) *People v. Patrick*, 2011 IL 111666, ¶ 27; see *Burtell*, 76 Ill. 2d at 436 (distinguishing the "jurisdictional question" from the question whether the appellee was

"misled or confused by the notice of appeal"). Since the defect at issue here was one of substance, prejudice is essentially presumed.

¶ 55    For these reasons, we hold that we lack jurisdiction to review the part of the dissolution judgment finding petitioner in indirect civil contempt of court.

¶ 56                              C. Property Classification/Division and Dissipation

¶ 57    Petitioner's final contention on appeal is that the trial court should have classified a trust account held in his name as his nonmarital property. The parties testified that, during the marriage, petitioner received substantial funds from the sale of Hallcrest stock. Subsequently, the parties established a family trust. For tax purposes, they opened two trust accounts. One account was held in petitioner's name and the other in respondent's name (for convenience, we refer to the accounts as "his account" and "her account," without implying how they should be classified). Neither had access to the other's account. They divided the funds from the stock sale between the two accounts. Later, when petitioner received an inheritance from his mother, he deposited the funds into his account. The parties used funds from both accounts to purchase and improve the marital residence. The trial court classified both accounts as marital property. The court awarded respondent her entire account but divided petitioner's account between the parties. The court also found that petitioner dissipated funds from his account.

¶ 58    Petitioner asserts that his trust account was his nonmarital property and that, consequently, the division of his account and the finding of dissipation were erroneous. Specifically, petitioner claims that the parties' agreement that each would have exclusive control over his or her own account was tantamount to an exchange of gifts. See 750 ILCS 5/503(a)(1) (West 2016) (nonmarital property includes property acquired as a gift).

¶ 59    We agree with respondent that petitioner forfeited his claim that his trust account is his nonmarital property. Prior to trial, the parties submitted a written "Trial Stipulation." The stipulation began by listing several items that the "parties own." The list included the two trust accounts. None of the property in the list was designated marital property as such, but there was a separate section in the stipulation for "Non-Marital" property, which listed only two items as respondent's: an individual retirement account and a whole life policy.

¶ 60    Petitioner's written closing argument was consistent with the stipulation. He addressed the trust accounts, noting his contributions to both accounts and the subsequent use of account funds to purchase and improve the marital home. He contended that, in light of these contributions, he should receive more than 50% of the marital estate. Petitioner did not claim that the trust accounts were the parties' gifts to each other. Petitioner attached to his closing argument a "Summary of Stipulated Facts." In the list of assets, only two—the same two in the stipulation—were designated his nonmarital property. Following the list was a proposed asset division in which each party was assigned his or her own trust account.

¶ 61    Expressly relying on the stipulation, the trial court included the trust accounts in the marital estate. In his motion to reconsider, petitioner argued, for the first time, that his trust account was a gift from respondent. The trial court refused to consider the merits of the contention because petitioner was attempting to "change [his] theory of the case postjudgment."

¶ 62    The trial court properly refused to consider petitioner's contention, as a litigant may not raise a legal theory for the first time in a motion to reconsider. See *Barth v. Kantowski*, 409 Ill. App. 3d 420, 426 (2011). We also will not consider the contention. See *Evanston Insurance*

*Co. v. Riseborough*, 2014 IL 114271, ¶ 36 ("Arguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal."). Accordingly, we affirm the classification of petitioner's trust account, the division of its funds between the parties, and the finding of dissipation.

¶ 63                              III. CONCLUSION

¶ 64        For the foregoing reasons, we affirm in part and vacate in part the judgment of the circuit court of Du Page County, and we remand this cause for further proceedings consistent with this opinion.

¶ 65        Affirmed in part and vacated in part.

¶ 66        Cause remanded.