NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190324-U

NO. 4-19-0324

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| LYNETTE DAWN CONOUR, | ) | Circuit Court of |
|     Petitioner-Appellee and Cross-Appellant, | ) | Macon County |
|     and | ) | No. 13D53 |
| JEFFREY SCOTT CONOUR, | ) | |
|     Respondent-Appellant and Cross- | ) | Honorable |
|     Appellee. | ) | James R. Coryell, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court did not err in its (1) award of maintenance, (2) valuation of marital property, (3) allocation of income to the petitioner, and (4) denial of petitioner's request for attorney fees.

¶ 2    In June 1994, petitioner, Lynette Conour (Lynette), and respondent, Jeffrey Conour (Jeff), were married. The marriage produced one child, A.C., born in October 1995. In February 2013, Lynette filed a petition for dissolution of marriage. In October 2018, the trial court entered a judgment of dissolution of marriage, reserving jurisdiction on all issues including the division of property, allocation of debts, and maintenance.

¶ 3    In May 2019, the trial court entered a written order determining, *inter alia*, that (1) Jeff shall pay $1995.48 per month in statutory maintenance to Lynette for a period of 14.8 years and applying retroactively to May 2018; (2) the value of a vacant lot adjacent to the former

marital residence was $597; (3) $10,512 shall be assessed against Lynette for taking Jeff's one-half share of their 2014, 2015, and a portion of the 2016 tax refunds; and (4) each party shall pay their own attorney fees.

¶ 4 This appeal and cross-appeal followed.

¶ 5        I. BACKGROUND

¶ 6 On February 4, 2013, Lynette filed a petition for dissolution of marriage. In July 2013, the trial court entered a temporary order (1) awarding temporary and exclusive possession and control of the marital residence to Lynette; (2) awarding temporary care, custody, control, and supervision of A.C. to Lynette; (3) directing Jeff to pay $250 per week to Lynette as temporary and partial child support; (4) directing Jeff to pay up to $80 per week to A.C. for his transportation expenses; and (5) directing Jeff to pay Lynette and A.C.'s mobile phone, automobile insurance, medical insurance, homeowner's insurance, and pet expenses.

¶ 7 Following a hearing on September 7, 2018, the trial court entered a bifurcated judgment of dissolution of marriage, reserving the issues of division of property, allocation of debts, and maintenance for future consideration.

¶ 8       A. October 2018 Proceedings

¶ 9 On October 26, 2018, the case proceeded to a trial on the remaining issues. Prior to the hearing, the parties stipulated to Exhibits 5 to 17, which consisted of the parties' joint tax returns from 2011 to 2016, as well as tax returns for Jeff's business, Machine Works of Decatur, Inc. (Machine Works), from the same time period.

¶ 10 Lynette testified that she and Jeff were married in 1994 and that she had a high school education. After graduating high school in 1988, she worked full time as a travel agent for two to three years and later as a secretary for a trucking company for two to three years. After

A.C. was born in 1995, she and Jeff agreed that she would not return to work so they could save on childcare expenses while Jeff worked full time at Caterpillar Inc. and opened Machine Works with his brother. To assist with the business, Lynette provided bookkeeping services, which she initially performed by hand. In this role, Lynette prepared invoices, filed documents, and paid bills for the company. Eventually, the company purchased a computer, which she learned to operate and used to perform her responsibilities. At the company's inception, Lynette worked about 15 to 20 hours per week; as the company grew within its first five years, her hours increased to around 20 to 30 per week.

¶ 11        Lynette testified that because Jeff was working at both Caterpillar and Machine Works, Lynette took care of all the household responsibilities in addition to caring for A.C. A.C. was involved in multiple sports, and Lynette provided transportation when travel was required. Following A.C.'s high school graduation in 2014, he attended Illinois State University (ISU) in Bloomington for one year. During that year, A.C. came home every weekend, and Lynette provided for his living expenses, including food, clothing, and spending money. After his first year in Bloomington, A.C. transferred to Richland Community College (Richland) in Decatur and moved back in with Lynette, where she again provided for his living expenses. A.C. returned to ISU for his junior and senior years. Lynette estimated that she spent "a hundred a month, or fifty a month" on A.C. during his junior year and "well over a thousand dollars" during his senior year at ISU.

¶ 12        Regarding her employment history, Lynette testified that she worked at Machine Works from the inception of the company until February 2013. She began looking for other employment in August 2012 because she and Jeff were experiencing marital problems. In addition to Machine Works, she worked part time, approximately 20 hours per week, at Advance

Vision Eye Care (Advance) from August 2012 to February 2013. In February 2013, she quit her job at Advance due to her belief there was too much "drama" in the workplace. On May 30, 2013, Jeff terminated her employment at Machine Works, and Lynette began searching for new employment. Lynette testified she was not employed between May 2013 and May 2014, though she applied at various veterinary offices and banks. In May 2014, she began working part time at Ruff-Inn-It, a boarding facility for pets. Lynette remained employed at Ruff-Inn-It, where she worked approximately 20 hours per week and earned $11.50 per hour. Lynette testified she was still actively searching for full-time employment but was struggling to find positions for which she was qualified because she had no other education (besides travel agent school) past high school. Lynette testified she received notices via email from four different employment websites to facilitate her job search.

¶ 13      Lynette testified that since their separation in 2013, she and Jeff continued to file their taxes jointly and, with their refund, they paid their property taxes and split the remainder. Lynette deposited her share of the remainder in her account but did not know if Jeff received his share by cash or check.

¶ 14      Lynette testified that she and Jeff purchased a vacant lot, called Lot #17, adjacent to the lot they purchased to build their former marital home. The lot consisted of one acre which Lynette explained was on a floodplain. They purchased Lot #17 not only to have more privacy from their neighbors but also as a space for A.C. to safely ride his motocross bikes and four-wheelers. She could not recall how much they paid for the lot but indicated that the seller "gave [them] a deal because it was—it could not be used for a house," to which Jeff objected. Lynette then introduced Exhibit 23a, which consisted of various photos of their marital home and surrounding land, which were taken in 2001, 2017, and 2018. The 2001 photos showed water

flooding into Lot #17 and children swimming in the flooded area. Lynette testified that the lot consistently flooded whenever it rained heavily. The 2017 photos showed a flooded creek behind Lot #17, and the 2018 photos also showed significant flooding into Lot #17. Lynette's financial affidavit, which was marked as petitioner's Exhibit 1, indicated that Lot #17 was worth $597. Lynette explained that she obtained that figure from their most recent property tax bill. Lynette also introduced petitioner's Exhibit 23c, which consisted of their 2017 property tax bill, and which indicated that Lot #17 had a fair market value of $597.

¶ 15        On cross-examination, Lynette clarified her previous testimony that she quit Advance in February 2013, indicating that was incorrect, and, in fact, she worked there until sometime in 2014. However, the parties agreed at oral argument that Lynette worked at Advance until sometime in 2016. Lynette said she was still trying to find a full-time position and had applied for a job roughly two weeks prior to the hearing. Before that, the last time she had applied for a job was in December 2017 when she applied for a receptionist position at Brush College Animal Hospital. Lynette testified that she did not reach out to any institutions of higher education or participate in any programs to upgrade her job skills between May 2013 and October 2018. Though she only worked until 1 p.m. on weekdays, she said she was not free during the afternoons because it took her roughly four hours, twice per week, to maintain the three acres of property around her home.

¶ 16        Lynette testified that she borrowed $6289.33 from her mother in order to pay the fee of her former attorney in this proceeding. She also owed $4625.60 to her current attorney, to whom she had already paid a $2500 retainer by using a credit card.

¶ 17        Regarding their 2016 joint tax return, Lynette testified their accountant made an error that required she and Jeff to pay approximately $5000 additional tax to the Internal

Revenue Service (IRS). Lynette paid no portion of the additional amount due. Lynette agreed that she received roughly $5000 of their tax refund, while Jeff, after paying the additional amount owed, received about $100. Lynette also agreed that, in previous years, the tax refunds they received were used to pay the property taxes for the former marital home.

¶ 18                           B. December 2018 Proceedings

¶ 19           The trial resumed on December 21, 2018.

¶ 20                           1. *Kevin Miller*

¶ 21           Kevin Miller testified he was a certified real estate appraiser in Forsyth, Illinois. Miller identified respondent's Exhibit 17 as his appraisal of Lot #17. According to Miller, Lot #17 was not on a floodplain and consisted of 1.29 acres. Though he had been informed that "[i]ssues have come up regarding water on the property," Miller stated he appraised the property "using an assumption that it was a buildable lot." When asked to explain, Miller stated, "The assumption is based upon if there is a—something to be learned subsequently after the appraisal is completed that its—it's not buildable, then it would basically render the appraisal null and void. But based—I based it on the assumption that it was a buildable lot."

¶ 22           Though Miller had been "apprised" of the issue of water on the property, he did not personally observe any water on the lot on the date of the appraisal. He did not check into any issues regarding water after he completed the appraisal. Though he spoke with another person about the subdivision, it was not specifically regarding Lot #17, and he had learned no new information following the appraisal that affected his appraised value of the lot. In his professional opinion, the lot was worth $17,500 at the time of the appraisal in 2016. He did not have an opinion as to current value of the lot.

¶ 23    On cross-examination, Miller testified he looked to the county assessor's office for information when completing the appraisal. He did not recall the assessed value, but acknowledged, after reviewing the 2017 property tax bill (petitioner's Exhibit 23c), the assessor's value was $597. He never discussed the issue of moisture on the property with Lynette and visited the site only once. Upon reviewing Exhibit 23a, which contained the photos of various instances of flooding on Lot #17 between 2001 and 2018, Miller stated he would "have to consult with an expert in the field" to determine whether the presence of standing water on the lot would change his opinion of its value.

¶ 24    Miller testified his appraisal report indicated that the elevation of Lot #17 was low "[c]ompared to the rest of the lots on the street" and that "it appears to be [a] less than ideal building site due to the potential[ly] poor drainage." Miller's report also stated that "determining if [Lot #17] is buildable is beyond the expertise of the appraiser and it is beyond the scope of an appraisal." Additionally, "absent a professional contractor quote," it would cost between $5000 and $10,000 "for site work required to make the [lot] ready to build on." Miller agreed that in its current state, Lot #17 was "not ready to build on."

¶ 25    On redirect examination, Miller testified he put very little weight on the assessed value in making an appraisal because assessors "go through a different process" and appraisers "develop an opinion of market value based on [their] research." Miller agreed that many vacant lots require some site preparation prior to building, and he included the cost of site preparation in his appraisal of Lot #17 due to its "low elevation" and "poor drainage."

¶ 26                                  2. *Jeff Conour*

¶ 27    Jeff Conour testified he currently lived in Decatur, Illinois, and started Machine Works with his brother in 1997. He currently held a 52% stake in the business. Between 1997

and May 2013, Lynette worked for Machine Works as a bookkeeper. During this time, Jeff worked at Caterpillar as a machine operator from 11:18 p.m. to 7:18 a.m., drove to Machine Works, and worked there until 1 or 2 p.m. Jeff resigned from Caterpillar in 2008 and thereafter worked full time at Machine Works.

¶ 28        Jeff testified that he had Lot #17 appraised in order to determine its value. Jeff informed Miller of the water conditions on the property and told him that it flooded periodically. He agreed with Miller's appraisal of $17,500. Jeff never intended to build anything on the lot but rather purchased it along with the land where he built the marital home in order to have more space.

¶ 29        Regarding his joint tax returns with Lynette, Jeff testified they received a refund every year, but he did not always receive his portion. In 2014, they received a $6212 refund. They paid their property taxes from that amount, but Lynette kept the remainder. Jeff stated the same thing happened in 2015 with their $9667 refund. In 2016, they received a $10,752 return, which they split after paying their property taxes. However, due to an accounting error, they were required to pay back an additional $5000 or so to the IRS. Jeff paid the balance and Lynette did not contribute. As a result, Jeff received only $42 from that year's refund.

¶ 30        On cross-examination, Jeff agreed that when he and Lynette purchased Lot #17, he did not believe the assessor's property valuation of $6575 was accurate and appealed it in December 1999. Following the appeal, the assessor reduced its valuation to $150. When Jeff spoke with Miller about the appraisal, Miller informed him he could find no information from the State of Illinois indicating the lot was on a floodplain, and consequently, he would appraise the lot as buildable.

¶ 31        At the conclusion of trial, the trial court ruled on the issue of maintenance, stating:

"The evidence I've heard over a couple of days of hearings is that [Lynette] is—has a part-time job now, it's a part-time basis, and essentially that is what she's done through the entire marriage.

She doesn't have any particular job skills. She's a mature person. She may be well served to develop the job skills. But the evidence we've got, the status quo is that this is what she's done throughout the duration of the marriage.

So I am going—and I have heard no dispute about the calculation supplied by [Lynette], so I am going to fix maintenance in the amount of $1,995.48 per month for a period of 14.8 years, commencing December 28, 2018."

The trial court then directed the parties to submit written arguments on the issue of the division of property and ordered that the February 2013 temporary order be terminated.

¶ 32                          C. Post-Trial Proceedings

¶ 33         On January 15, 2019, Jeff filed a motion to reconsider the trial court's maintenance decision, arguing that the trial court erred, *inter alia*, by failing to (1) impute income to Lynette because she was voluntarily underemployed and (2) address whether the maintenance order would apply retroactively to the date A.C. graduated from high school. On January 18, 2019, Lynette filed a motion for contribution of attorney fees and costs.

¶ 34         On February 14, 2019, the trial court entered a written order determining, *inter alia*, that (1) Jeff shall pay $1995.48 per month in statutory maintenance to Lynette for a period of 14.8 years; (2) the value of Lot #17 was $597; (3) $10,512 shall be assessed against Lynette for taking Jeff's one-half share of their 2014, 2015, and a portion of the 2016 tax refunds; and (4) each party shall pay their own attorney fees.

¶ 35         This appeal and cross-appeal followed.

¶ 36                                II. ANALYSIS

¶ 37                            A. Lynette's Maintenance

¶ 38        The parties each raise claims of error pertaining to the trial court's statutory maintenance award. Specifically, Jeff argues the trial court abused its discretion when it (1) failed to impute income to Lynette based on her voluntary underemployment and (2) ordered that maintenance would apply retroactively commencing in May 2018 rather than May 2014. Lynette argues the trial court abused its discretion when it did not permit her to secure her maintenance award with life insurance. We address each of these issues in turn.

¶ 39                            1. *Applicable Law*

¶ 40        Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/504(a) (West 2018)) provides that in a dissolution proceeding, the trial court "may grant" maintenance in an amount and for a period of time "as the court deems just." "[T]he propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *In re Marriage of Schneider*, 214 Ill. 2d 152, 173, 824 N.E.2d 177, 189 (2005). When considering whether a maintenance award is appropriate, section 504(a) sets forth 14 factors for the trial court to consider, including:

>        "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;
>
>        (2) the needs of each party;
>
>        (3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2018).

¶ 41        If the court concludes maintenance is appropriate, the court shall then determine the duration and amount of maintenance according to section 504(b-1) of the Dissolution Act. 750 ILCS 5/504(b-1) (West 2018). In doing so, " 'the trial court must balance the ability of the spouse to support himself [or herself] in some approximation to the standard of living he [or she] enjoyed during the marriage.' " *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10, 967 N.E.2d 358 (quoting *In re Marriage of Shinn*, 313 Ill. App. 3d 317, 322, 729 N.E.2d 546, 550 (2000)).

¶ 42                        2. *Voluntary Underemployment*

¶ 43        The Dissolution Act "creates an affirmative duty on a spouse requesting maintenance to seek and accept appropriate employment." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 73, 77 N.E.3d 1000. "In order to impute income to a party, the court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 44, 29 N.E.3d 1197. "Imputation is appropriate in cases of voluntary unemployment or voluntary underemployment." *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39, 83 N.E.3d 19; see also *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶¶ 29-31, 59 N.E.3d 135. We review the trial court's decision whether to impute income for an abuse of discretion. *Ruvola*, 2017 IL App (2d) 160737, ¶ 39. "A court abuses its discretion only where no reasonable person would take the view adopted by the court." *Ruvola*, 2017 IL App (2d) 160737, ¶ 39.

¶ 44          Here, the trial court's decision not to impute income to Lynette based on her

allegedly voluntary underemployment was not an abuse of discretion. The trial court found—and

Jeff does not dispute—that Lynette did not have "any particular job skills" and no education past

high school. Lynette's testimony showed that she had made efforts to obtain full-time

employment by using websites such as Indeed and Jobfinder. She also networked with

professionals she encountered at Ruff-Inn-It and applied for two receptionist positions for which

she believed she was qualified. Although the court acknowledged that Lynette did not make

efforts to upgrade her job skills by seeking assistance at a career center or at Richland, Jeff cites

to no authority which would have required Lynette to have done so. Jeff argues the trial court's

reference to "status quo" applied an inappropriate standard to the determination of maintenance.

The comment, however, needs to be considered in context. Although perhaps an unfortunate

choice of words, the court was noting the nature of the work she sought and obtained now was

substantially similar to the type of employment she had throughout the course of the marriage.

Lynette was required to seek "appropriate" employment and has done so by maintaining her

position at Ruff-Inn-It and continuing her search for a permanent full-time position. We find no

evidence in the record to suggest Lynette is voluntarily unemployed, is attempting to avoid a

support obligation, or has failed to take advantage of a viable employment opportunity. See

*Ruvola*, 2017 IL App (2d) 160737, ¶ 39. The trial court's determination that Lynette made good-

faith efforts to become self-sufficient and therefore that income should not be imputed to her was

not an abuse of discretion.

¶ 45                                    3. *Retroactivity*

¶ 46          Jeff contends that the maintenance award should apply retroactively to May 2014

when A.C. graduated high school because the child support payments he made to Lynette

- 13 -

pursuant to the February 2013 temporary order could not have been child support as a matter of law. In other words, Jeff argues the trial court should have recharacterized his support payments after A.C.'s high school graduation as maintenance and credited those payments towards the retroactivity of the maintenance award. We disagree.

¶ 47 The Dissolution Act provides that the court, in its discretion, may determine whether "any term of temporary maintenance paid by court order under Section 501 may be a corresponding credit to the duration of maintenance set forth in subparagraph (b-1)(1)(B)." 750 ILCS 5/504(b-1)(1.5) (West 2018). As stated *supra*, "the propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *Schneider*, 214 Ill. 2d at 173. This standard applies to both the amount and the duration of maintenance (*In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 707, 850 N.E.2d 880, 885 (2005)), as well as the amount and duration of retroactive maintenance. See *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 659, 895 N.E.2d 1025, 1044 (2008).

¶ 48 Here, the trial court's determination that maintenance would apply retroactively to May 2018 (the date of A.C.'s college graduation) was not an abuse of discretion. Although A.C. was no longer a "child" after May 2014 as defined by section 505 of the Dissolution Act (750 ILCS 5/505(a) (West 2018)), Jeff agreed—with the assistance of counsel—to make the support payments outlined in the February 2013 temporary order. Moreover, Jeff failed to request a modification to rename or reclassify the nature of the payments as maintenance at any time while the order was in effect. The trial court found Jeff's request that the maintenance award apply retroactively to May 2014 was not supported by any authority, and Jeff again fails to cite to any authority for this argument on appeal. We agree with the trial court that Jeff "had a child who was attending college and was in need of funds" and that Jeff "agreed to pay those monies as

- 14 -

support." Although Lynette never sought a post-majority education expense order under section 513 of the Dissolution Act (750 ILCS 5/513 (West 2018)) and the majority of A.C.'s college expenses were paid through his college fund, Lynette's testimony indicated that A.C. spent a significant amount of time at Lynette's home on the weekends during his time at ISU and lived with her during his year at Richland. Lynette further testified she spent several thousand dollars on A.C. throughout college for his haircuts, groceries, household products, clothing, and spending money. Accordingly, the trial court's decision not to recharacterize Jeff's support payments to Lynette as maintenance and apply the maintenance award retroactively to May 2014 was not an abuse of discretion.

¶ 49                                      4. *Life Insurance*

¶ 50          Lynette argues the trial court erred in not ordering Jeff to secure her maintenance award with life insurance. We disagree.

¶ 51          Section 504(f) of the Dissolution Act states,

> "An award ordered by a court upon entry of a dissolution judgment or upon entry of an award of maintenance following a reservation of maintenance in a dissolution judgment may be reasonably secured, in whole or in part, by life insurance on the payor's life on terms as to which the parties agree or, if the parties do not agree, on such terms determined by the court, subject to the following:

> * * *

>> (2) To the extent the court determines that its award should be secured, in whole or in part, by new life insurance on the payor's life, the court may only order:

- 15 -

(i) that the payor cooperate on all appropriate steps for the payee to obtain such new life insurance; and

(ii) that the payee, at his or her sole option and expense, may obtain such new life insurance on the payor's life up to a maximum level of death benefit coverage, or descending death benefit coverage, as is set by the court ***."

A reviewing court will not disturb a trial court's decision requiring maintenance to be secured by life insurance absent an abuse of discretion. See *Brankin*, 2012 IL App (2d) 110203, ¶ 34 (concluding that the trial court has "discretion to award a form of security, such as life insurance, for a maintenance obligation").

¶ 52　　　　In her written closing argument, Lynette requested that the trial court order Jeff to provide life insurance to secure her maintenance award. Jeff did not respond to Lynette's request in his closing argument and the court did not address life insurance in the dissolution judgment.

¶ 53　　　　We note, in a civil bench trial, "a litigant may forego filing a post-trial motion and may assert as error grounds raised for the first time on appeal." *In re Marriage of Steadman*, 283 Ill. App. 3d 703, 712, 670 N.E.2d 1146, 1153 (1996); Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994) ("Neither the filing of nor the failure to file a post-judgment motion limits the scope of review."). However, "the preferable practice would be to raise possible errors for the trial court's consideration." *In re Marriage of Wright*, 212 Ill. App. 3d 392, 398, 571 N.E.2d 197, 201 (1991).

¶ 54　　　　Here, the failure to raise the issue in the trial court leaves it unclear whether the court failed to consider Lynette's life insurance request or rejected it without comment. On appeal, Lynette simply states that this "would not prevent the trial court from ordering Jeff to cooperate in Lynette obtaining life insurance to secure maintenance." Without more, we find

Lynette has failed to show the trial court abused its discretion when it did not order that her maintenance award be secured by life insurance, or that the record supports making that determination at this stage of the proceedings.

¶ 55                                              B. Vacant Lot

¶ 56          Jeff argues the trial judge's valuation of Lot #17 was contrary to the manifest weight of the evidence. We disagree.

¶ 57          "Generally, the valuation of a marital asset is an issue of fact, and the trial court's ruling will not be disturbed unless it was against the manifest weight of the evidence." *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 56, 87 N.E.3d 302; see also *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 699-700, 843 N.E.2d 478, 482-83 (2006). A finding is "against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61, 920 N.E.2d 1147, 1153 (2009).

¶ 58          Here, the trial court's valuation of Lot #17 was not contrary to the manifest weight of the evidence. Lynette presented ample evidence of the lot's value, including the property tax bill for the land and various photos showing that the lot was periodically subject to significant flooding. Moreover, Miller testified that he never discussed the issue of flooding with Lynette when conducting his appraisal and only visited the site once. Upon reviewing the photos of the various instances of flooding, Miller stated he would "have to consult with an expert in the field" to determine whether the presence of standing water on the lot would change his opinion of its value. Miller also testified that Lot #17 "appears to be [a] less than ideal building site due to the potential[ly] poor drainage" and that "determining if [Lot #17] is buildable is beyond the expertise of the appraiser and it is beyond the scope of an appraisal." Miller agreed that in its

current state, Lot #17 was "not ready to build on." The credibility of Miller's appraisal was undermined by the uncertainty of whether the lot could ever be buildable. Finally, it is telling that Jeff appealed the county assessor's valuation of the lot shortly after they purchased it in order to significantly reduce their property tax bill and enjoyed the benefit of that reduced valuation throughout the marriage, only now contending the property must be valued at an amount almost thirty times higher.

¶ 59       Accordingly, the trial court's acceptance of Lynette's $597 figure rather than Jeff's $17,500 figure was not contrary to the manifest weight of the evidence.

¶ 60                               C. Tax Refund

¶ 61       Lynette argues the trial court erred in allocating $10,512 in income to her for taking Jeff's one-half share of the 2014, 2015, and a portion of the 2016 tax refunds. We disagree.

¶ 62       "[T]he proper division of marital property rests within the sound discretion of the trial court [citation], not this court, and [the appellate court] cannot reverse a trial court's division of property absent an abuse of discretion." *In re Marriage of Koral*, 194 Ill. App. 3d 933, 943, 551 N.E.2d 242, 248 (1989).

¶ 63       Here, the trial court's allocation of $10,512 to Lynette was not an abuse of discretion. Jeff attached the parties' joint income tax returns to his statement of position and testified that the refunds for 2014 and 2015 were $6212 and $9667, respectively. Additionally, he averred in his financial affidavit the property tax payment on the former marital home (where Lynette still resided) was $4644 annually. Although he agreed with Lynette's testimony that they paid the property taxes from their tax refund, he disagreed that they split the balance evenly—instead claiming that Lynette kept it all. Although he also agreed that he and Lynette split the

initial 2016 refund of $10,752 after paying the property taxes, Jeff paid an additional $5145 in taxes that were owed to the IRS after they discovered an accounting error. Lynette did not contribute to the additional amount that was owed, and as a result, Jeff received only $42 from the 2016 tax refund. The trial court had ample evidence in the record to support its decision and was permitted to find that Jeff's testimony was more credible than Lynette's. See *In re Marriage of McHenry*, 292 Ill. App. 3d 634, 641, 686 N.E.2d 670, 675 (1997). We therefore find no abuse of discretion in the trial court's allocation of income to Lynette.

¶ 64                                    D. Attorney Fees

¶ 65        Finally, Lynette argues the trial court abused its discretion in denying her request that Jeff contribute to her attorney fees. We disagree.

¶ 66        Generally, attorney fees are the primary responsibility of the person for whom the services are rendered. *In re Marriage of Bolte*, 2012 IL App (3d) 110791, ¶ 28, 975 N.E.2d 1257. Pursuant to section 508(a) of the Dissolution Act, the trial court has the discretion based on the financial resources of the parties to order one party to pay all or part of the other's attorney fees. See 750 ILCS 5/508(a) (West 2018).

¶ 67        Our supreme court has noted a party seeking an award of attorney fees must establish he or she is unable to pay the fees and the other party is able to pay them. *Schneider*, 214 Ill. 2d at 174. "[A] party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Heroy*, 2017 IL 120205, ¶ 19. Thus, in awarding attorney fees under section 508 of the Dissolution Act, the trial court must "(1) 'consider[ ] the financial resources of the parties' and (2) make its decision on a petition for contribution 'in accordance with subsection (j) of Section 503.' " *Heroy*, 2017 IL 120205, ¶ 19 (quoting 750 ILCS 5/508(a)

(West 2014)). Section 503(j)(2) of the Dissolution Act (750 ILCS 5/503(j)(2) (West 2018)) provides the following: "Any award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." We review the trial court's decision to award or deny attorney fees under section 508(a)(4) for an abuse of discretion. *In re Marriage of Benjamin*, 2017 IL App (1st) 161862, ¶ 30, 82 N.E.3d 867.

¶ 68 Here, the trial court did not abuse its discretion in denying Lynette's request that Jeff contribute to her attorney fees. Although the record does not show what the trial court considered in denying Lynette's request for fees, including any evidence it may have used in making its determination, "[t]he [trial] court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." *Cavitt v. Repel*, 2015 IL App (1st) 133382, ¶ 64, 32 N.E.3d 712. Finding no such showing, we assume the trial court considered both Lynette's and Jeff's financial resources and properly made its decision in accordance with subsection (j) of section 503 of the Dissolution Act. See *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 91. Thus, the trial court did not abuse its discretion in denying Lynette's request for attorney fees.

¶ 69 III. CONCLUSION

¶ 70 For the reasons stated, we affirm the trial court's judgment.

¶ 71 Affirmed.