2022 IL App (2d) 210375-U
No. 2-21-0375
Order filed December 2, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| JAMES CZERNIAK, | ) | of Kane County. |
| | ) | |
| Petitioner-Appellee and | ) | |
| Cross-Appellant, | ) | |
| and | ) | No. 19-D-0164 |
| | ) | |
| PAMELA CZERNIAK, | ) | |
| | ) | Honorable |
| Respondent-Appellant and | ) | Christine Downs, |
| Cross-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in denying motions to continue, issuing sanctions, or awarding maintenance.  As such, we affirm the judgment of dissolution.  Affirmed.

¶ 2   On June 22, 2021, the trial court entered a judgment of dissolution for the parties, petitioner-appellee/cross-appellant, James Czerniak, and respondent-appellant/cross-appellee, Pamela Czerniak.  Pamela appeals, challenging the trial court's: (1) denial of her motions to continue the trial; (2) granting of James's motion for sanctions pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) (barring testimony); (3) granting of James's motion for sanctions

pursuant to section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(b) (West 2020)) (attorney fees); and (4) decision to impute $50,000 in income to Pamela for the purposes of calculating maintenance. James cross-appeals, arguing that the trial court did not follow the strictures of section 504(f) of the Act when it ordered that James secure his maintenance obligation with a life insurance policy. 750 ILCS 5/504(f) (West 2020). For the reasons that follow, we reject these arguments. Affirmed.

¶ 3                                I. BACKGROUND

¶ 4     On February 19, 2019, James petitioned for divorce. At that time, James and Pamela were in their late forties/early fifties and had three grown—or nearly grown—children (born in 1999, 2001, and 2002). The proceedings were contentious, with Pamela committing discovery violations, filing several motions to continue, and employing 10 different attorneys.

¶ 5                     A. Pamela's Motions to Continue Trial

¶ 6     We begin our recitation of the facts with the actions taken by Pamela's sixth counsel of record, who, on September 30, 2020, moved to continue the trial. The motion alleged that neither the discovery regarding James's income taxes nor the discovery regarding his performance metric with his employer, Morgan Stanley, would be complete until December 2020. The trial court granted the motion, continuing the trial to February 8, 2021. It specified that no further continuances would be granted.

¶ 7     On December 15, 2020, Pamela filed a second motion to continue the trial date. Pamela alleged that the Morgan Stanley discovery had not been completed. However, on January 5, 2021, the trial court entered an agreed order, denying the motion to continue trial "for all the reasons stated on the record."[1] The agreed order moved up the trial date to January 15, 2021. Also, Pamela

_____

[1]The transcripts from the January 5, 2021, hearing are not in the record.

had filed a motion to compel against Morgan Stanley, and the court gave Morgan Stanley leave to respond.

¶ 8    On January 11, 2021, Morgan Stanley answered Pamela's motion to compel. It asserted that it had already fully complied with Pamela's first two subpoenas, furnishing over 2200 pages of documentation. The requests in the third subpoena were either redundant or irrelevant. The irrelevant requests centered on Pamela's false belief that the client accounts managed by James are somehow a marital asset. However, James has no ownership interest in these client accounts. The clients contract with Morgan Stanley, not James. James's employment agreement shows that, if he left Morgan Stanley, he would not be permitted to take client information with him or solicit any Morgan Stanley clients for a 12-month period. Instead, James's earnings consist of a salary, commissions, and bonuses.

¶ 9    On January 12, 2021, Pamela's attorney, her seventh, moved for, and was granted, leave to withdraw.

¶ 10    On February 10, 2021, the trial court heard Pamela's motion to compel.[2] In a written order, the court accepted Morgan Stanley's positions and determined that Morgan Stanley had complied with all relevant portions of Pamela's subpoenas. It further ordered that neither Pamela, nor anyone on her behalf, may issue further subpoenas without leave of the court. The trial date was set for May 3, 2021, and the court noted that "all trial dates shall stand."

¶ 11    On March 2, 2021, Pamela, represented by new counsel, filed a third motion to continue trial. Pamela again alleged that Morgan Stanley had not complied with discovery. James responded that this issue had already been ruled upon and that Pamela's high turnover in counsel contributed to the redundant filings. The court denied the motion.

_____

[2]The transcripts from the hearing are not in the record.

¶ 12    On March 26, 2021, Pamela's attorney, her eighth, moved to withdraw, noting that she could no longer represent Pamela within the "bounds of [her] ethical obligations." The trial court granted the motion, gave Pamela 21 days to obtain new counsel or enter a *pro se* appearance, and admonished that "the [May 2021] trial dates are to stand."

¶ 13    On April 20, 2021, Pamela, appearing *pro se*, filed a fourth motion to continue trial. Pamela alleged, *inter alia*, that she had obtained a financial expert to testify to the value of James's book of business, but the expert would need further information from Morgan Stanley.

¶ 14    On April 30, 2021, the trial court heard and denied Pamela's motion. It recounted that Pamela had run through numerous attorneys, several of whom sought to withdraw "when a position is being taken that the attorney feels that they cannot ethically advance." The court also recounted that, at the February 2021 hearing, Morgan Stanley had detailed what it had already provided and had averred that no further information existed. In fact, the trial court noted, Morgan Stanley had considered filing a harassment suit against Pamela. The court had earlier given Pamela leave to depose James or a representative from Morgan Stanley on the issue, and she had chosen not to do so. The court concluded: "And so, there comes a point when it becomes clear that this will continue to be the pattern if the Court does not put a stop to it. And that is what's going to occur. The matter is going to proceed on Monday."

¶ 15    On May 3, 2021, the first day of trial, new counsel for Pamela appeared, Charles Rea. In addition, two attorneys were present as consultants but did not file an appearance. Rea moved to reconsider the court's denial of Pamela's fourth motion to continue. When Rea explained that he sought outstanding discovery documents from Morgan Stanley, the court responded that it had already ruled on the issue in February 2021. The court again stated that Pamela had never deposed James or anyone from Morgan Stanley on the topic, and this was a failure "by choice." The court

concluded that there has never been any "credible information that [Pamela] has supplied in any manner *** regarding [James's] pay that hasn't [already] been disclosed."

¶ 16    On May 4, 2021, Rea moved to withdraw, asserting that there was a "conflict" between himself and Pamela, the "disclosure of which may violate attorney client confidentiality[.]" Upon further discussion with Pamela, however, Rea withdrew the motion to withdraw. On June 3, 2021, Rea again moved to withdraw, explaining that Pamela engaged in conduct that made it "unreasonably difficult" to continue representation. Specifically, Pamela had filed a motion in Rea's name to "postpone trial" pending additional information regarding James's employment income, but Rea had taken no part in the motion. Again, however, Rea and Pamela came to an agreement, and Rea continued to represent Pamela through the end of the trial.

¶ 17                              B. James's Rule 219 Motion

¶ 18    Meanwhile, on March 20, 2021, James moved pursuant to Rule 219 to bar Pamela from presenting, *inter alia*, evidence and testimony pertaining to James's relationship with Morgan Stanley. Rule 219 allows for the court to impose sanctions, such as barring testimony, when a party fails to comply with discovery. Ill. S. Ct. R. 219 (eff. July 1, 2002). James argued as follows. Throughout the case, Pamela has claimed that she was privy to James's employment negotiations. Pamela has relied upon this claim in seeking numerous continuances from the trial court. Yet, at her deposition, Pamela could not recall any details about the meetings she allegedly attended, claimed attorney-client privilege, and answered "I don't know" when asked about the topic. Pamela had not provided an expert report and, James stressed, the court had earlier ordered that, "[a]ll reports and opinions not disclosed by [March 24, 2021] shall be barred." The March 2021 deadline was itself an extension of two earlier deadlines.

¶ 19    The trial court conducted a hearing on the Rule 219 motion, ultimately granting the motion. As to Pamela's testimony on the topic of Morgan Stanley, the court explained that nearly every conflict in the proceedings thus far had pertained to Pamela's allegation that some portion of James's employment at Morgan Stanley was a marital asset. Still, in deposition, Pamela refused to answer any questions on the topic. The court noted that it has found and continues to find that Pamela has "frustrated the [discovery] process all the way." As to Pamela's expert's testimony on the topic of Morgan Stanley, the court explained that Pamela had failed to timely disclose the expert's report. In fact, Pamela had conceded that her expert had been unable to formulate an opinion based on insufficient information notwithstanding the court's finding that Morgan Stanley had submitted all available pertinent documentation.

¶ 20                          C. The Trial

¶ 21    The trial took place over 13 days in May and June 2021. Relevant here, Pamela testified that, in October 2018, she resigned from an IT job which paid approximately $50,000 annually. She wanted to devote more time to her children's education. In 2018, the children were ages 16 to 19. Her youngest son had had a special education plan for many years. When the pandemic occurred, she wanted to help her children with remote learning and secure tutors for them. She sought employment that would enable her to continue these activities. She went on three interviews between October 2018 and February 2019. More recently, she networked with several former colleagues, though without success. She also took self-paced education courses.

¶ 22              D. James's Mid-Trial Section 508(b) Motion

¶ 23    On June 7, 2021, the ninth day of trial, James filed a signed and certified motion for section 508(b) sanctions. Section 508(b) allows for the trial court to award attorney fees when a party to a proceeding under the Act has acted so as to "needlessly increas[e] the cost of litigation." 750

ILCS 5/508(b) (West 2020).  The motion set forth many examples of Pamela's improper acts, including Pamela's unfounded motions to continue; discovery delays (producing during trial documents which were due a year earlier); excessive attorneys (necessitating James's attorney to discuss the same information and send the same documents over and over again); and excessive time spent questioning witnesses regarding irrelevant and/or cumulative evidence (noting that Pamela's own counsel stated that "it was not lost on him that we were on Day 9 of a trial that should have only taken approximately 4 days").  The motion also alleged that Pamela's accounting showed that her family paid for the litigation, providing her little incentive to complete it.  Finally, the motion reported that James entered the week prior to trial with $35,000 in attorney fees and, since then, his fees have risen to $78,500.  The motion did not include an attached affidavit.

¶ 24     That day, James's attorney sent written notice of the section 508(b) motion to Pamela's attorney.  He wrote: "Please take notice that on June 7, 2021, at 1:30 p.m., or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Downs *** for presentation of the section 508(b) Motion for Fees and Sanctions, hereby served on you."

¶ 25     That day, James's attorney presented the section 508(b) motion:

> "MS. CARDER: Judge, before we start, *** I filed *** [a section 508(b)] motion for fees and sanctions just for presentation today.  I had advised Mr. Rea if he wanted time to argue it.
>
> THE COURT: *** [W]e need to hit the ground running on the testimony itself, so let's pick that up maybe first thing tomorrow.  Maybe if you come a little early tomorrow, we'll be able to discuss the next steps.  So, at this point, I want to begin."

Pamela's attorney did not object.  The June 8, 2021, transcripts do not show any discussion of the next steps.

¶ 26                    E. The Parties' Proposed Judgments of Dissolution

¶ 27    On June 11, 2021, the trial court informed the parties that it planned to issue a judgment by June 23, 2021. Each of the parties gave closing argument, but also noted that certain closing points were encapsulated in respective proposed judgments of dissolution. The trial court entered Pamela and James's proposed judgments of dissolution as exhibits 1 and 2, respectively.

¶ 28    James's proposed judgment of dissolution addressed the section 508(b) sanctions/attorney fees:

> "Prior to disbursing funds to Pamela and from Pamela's share of the loan funds, James shall pay to [his law firm], [The] Carder Law Firm, P.C. the sum of $ _____ as and for sanctions pursuant to Section 508(b) of the Illinois Marriage and Dissolution of Marriage Act."

¶ 29    Pamela later submitted a responsive and/or supplementary judgment of dissolution, labeled court exhibit 3. It summarily addressed the question of sanctions, providing in total: "A response to a Motion for [section 508(b)] Fees and Sanctions will be filed."

¶ 30    On June 21, 2021, Pamela filed a response to the motion for section 508(b) sanctions/attorney fees, essentially claiming insufficient evidence to confirm or deny, or affirmatively denying, each allegation. Pamela's attorney did not request a hearing.

¶ 31    Pamela's proposed judgment of dissolution also addressed maintenance. Pamela wrote that it was necessary to secure her maintenance award with a life insurance policy on James, in the amount of $1.4 million. James would maintain the $1.4 million policy. In addition, Pamela would be permitted to maintain an additional policy on James's life, up to $2.6 million. James's proposed judgment agreed that maintenance was appropriate but did not address the need to secure Pamela's maintenance with an insurance policy on his life.

¶ 32                    F. The Trial Court's Judgment

¶ 33    On June 22, 2021, the trial court entered a written judgment of dissolution, which largely mirrored the draft proposed by James. It also made corresponding oral findings. We set forth the written and oral findings in tandem.

¶ 34    The trial court orally addressed each party's credibility. It found James to be an "extremely credible witness." Pamela, "on the other hand, completely lacked credibility," and was "unwilling[] to cooperate" when questioned at trial. The court further stated that the most contested issue was James's income, but that issue was "only complicated because Pamela made it complicated." The court rejected the notion that the Morgan Stanley assets under James's management belonged to him in any way.

¶ 35    On the issue of James's motion for section 508(b) sanctions/attorney fees, the trial court wrote:

    "1. Prior to disbursing funds to Pamela and from Pamela's share of the [Morgan Stanley] loan funds, James shall pay to Carder Law Firm, P.C. the sum of $10,000.00 as and for sanctions pursuant to Section 508(b) of the Illinois Marriage and Dissolution of Marriage Act. The Court finds that Pamela has acted improperly in that many acts during the pendency of the case and the trial itself have needlessly increased the costs of litigation."

    2. Other than set forth above, each party shall pay his or her own respective attorne[y] fees."

¶ 36    The trial court explained its section 508(b) award, providing orally:

"I also had a brief meeting with the attorneys yesterday to clarify something [regarding the section 508(b) award] in [James's] proposed judgment. I have also received and reviewed [Pamela's] response to fees and sanctions that was filed on June 21st.

*** I am prepared to rule.

* * *

I do find that 508(b) sanctions are appropriate in this case. We've said over and over again Mr. Rea is attorney No. 11 on this file, and Ms. Carder has had to educate each lawyer. That is very apparent. There were repetitive subpoenas sent out. Ms. Czerniak's deposition was taken, at that time she had every opportunity to explain what her belief and theory of the case was and the evidence that supported what came to be these two unbelievable proposed judgments, and yet she refused to answer questions, wasting everyone's time, and in the end, it ended up having her positions on certain issues being barred because she refused to share the information. Even when being told by her lawyers to answer questions, she refused to do so. Mr. Czerniak's attorney had to respond to the unauthorized filing of documents during trial, had to try to make up for the fact that Ms. Czerniak didn't turn over her exhibits, and then produced documents during the trial."

¶ 37    The court elsewhere elaborated that, at times, James justifiably required extra time to answer questions, because Pamela asked about "minute details [in] documents that on many occasions had not been tendered [at all], or had been tendered during the course of the trial." Pamela, in turn, testified as if she had never seen certain documents before and took minutes to answer—sometimes even asking for a complete break to review the documents—even though each of James's exhibits had been timely tendered and disclosed. She managed to avoid answering many questions altogether.

¶ 38    On the issue of maintenance, the trial court began its written order by recounting Pamela's work history. Pamela stayed home with the children from 2004 to 2007. In late 2007, she re-entered the workforce in the IT field. Her earnings in the years preceding the divorce were $19,638 (2015, part-time), $63,674 (2016, full-time), $56,159 (2017, full-time), and $48,404 (the first 10 months of 2018, full-time). The court noted that Pamela had voluntarily resigned from her job in 2018 and it imputed an income of $50,000 to Pamela.

¶ 39    The trial court explained its decision to impute $50,000 in income to Pamela, providing orally:

> "[Pamela] worked for much of the marriage, as I said, other than the early years *** with the children, then inexplicably after 2018 she stopped. She made no effort to become re-employed after voluntarily leaving her job shortly before the divorce was filed.
>
> *** [T]he court has been asked to impute income to [Pamela] due to her voluntary unemployment. She's testified that she's maintained her skills and is self-educating, and for purposes of maintenance calculations, I do find that the suggestion of imputing $50,000 to [Pamela] is appropriate. I arrived at this by averaging her last four years. I recognize that the first year of the four[-]year block was part-time, and that average comes to about $46,000. And then I averaged without considering the part-time, and it comes to about $56,000. So, in averaging those, I concur and arrive at $50,000 in imputation of income."

¶ 40    The trial court addressed James's work history, writing that James worked throughout the marriage as a financial planner. In 2017, he began working for Morgan Stanley. His earnings, including bonuses, in the years preceding the divorce were $239,797 (2018); $230,359 (2019); and $246,350 (2020). (The bonus portion of James's earnings were related to a Morgan Stanley loan fund and are not at issue in this appeal.)

¶ 41    The trial court determined that maintenance to Pamela was appropriate.  In deciding the appropriate amount, it first referenced a guideline amount of $4637, which appears to have been based on $250,000 in income for James.  However, it ultimately deviated downward from the guideline amount, citing the appropriate statutory provisions, and accepting a chart put forth by James.  The chart prorated Pamela's maintenance according to James's income, beginning at $75,000:

| James's Gross Commissions and Deferred Comp. | Percentage of Gross Amount Payable to Pamela |
| --- | --- |
| $75,001 to $85,000 | 3.5% of the amount from $75,001 to $85,000 |
| $85,001 to $100,000 | 7.0% of the amount from $85,001 to $100,000 |
| $100,001 to $125,000 | 10.5% of the amount from $100,001 to $125,000 |
| $125,001 to $150,000 | 13.0% of the amount from $125,001 to $150,000 |
| $150,001 to $175,000 | 15.3% of the amount from $150,001 to $175,000 |
| $175,001 to $200,000 | 16.5% of the amount from $175,001 to $200,000 |
| $200,001 to $225,000 | 17.0% of the amount from $200,001 to $225,000 |
| $225,001 to $250,000 | 17.5% of the amount from $225,001 to $250,000 |
| $250,000 and above | 0% |

(Neither the chart nor the proration aspect of the maintenance award is at issue on appeal.)

¶ 42    The trial court's written order provided that the maintenance award should be secured with a life insurance policy:

"3. James, at his expense, is to maintain any and all life insurance benefits[] that were in existence at the time of filing the Petition, and/or the date of judgment, whichever has a greater level or benefit, up to a maximum of one million dollars, with Pamela as the

beneficiary, for so long as James has an obligation to Pamela. James to provide proof of life insurance within 30 days of the judgment.

4. Pamela may obtain at her sole option and expense, additional life insurance on James' life of up to the difference between any benefits in paragraph 3 and one million dollars."

¶ 43 The trial court explained its decision to secure the maintenance with life insurance, providing orally:

"[Pamela's] position on life insurance as set forth in the proposed judgments certainly did not take into account what the statute says, and I'm certainly paraphrasing, but the Court cannot order life insurance that the party doesn't already have, and so while I do believe it is appropriate to secure the maintenance obligation with life insurance, the Court cannot order what was not already there. So, therefore, what the Court will order is that James, at his expense, is to maintain any and all life insurance benefits that were in existence at the time of the filing of petition and/or the date of judgment, whichever has a greater level of benefit. So, *I did not recall testimony specifically about life insurance*, and my point is if there was life insurance at the time of the filing of the petition that had a greater benefit than he has right now, then that greater benefit is what I'm ordering, and up to $1 million. If Mr. Czerniak has a policy over $1 million, Pamela only needs to be a beneficiary of up to $1 million. Now, under the statute I can order, and I do order, that Pamela may, at her sole option and expense, obtain additional life insurance on James' life, but only up to the difference between the benefits in paragraph three, and $1 million. So, therefore, Mr. Czerniak is to provide proof of life insurance within 30 days of this judgment

so Ms. Czerniak can determine whether she is going to take out additional life insurance on Mr. Czerniak." (Emphasis added.)

¶ 44 Finally, the marital estate was split 50/50, with the exception of one asset, the Morgan Stanley Loan fund, which was split 55/45 in Pamela's favor. When considering marital assets against marital debts, the value of the marital estate was minimal. In fact, the trial court went so far as to describe the parties' finances as "dire." It elaborated: "The evidence shows that the finances of these parties is actually quite dire due to the divorce. [James] explained how he took this job in 2017, had a modest salary at first, and then went on to almost completely commissions. He explained how COVID has impacted his ability to network and bring in clients." Also, in the context of determining that neither party had the ability to pay for their children's college expenses, the court stated: "[I]n order for the parents to pay that, they would have to tap into what little liquid amount of money there is."

¶ 45 This appeal and cross-appeal followed.

¶ 46 II. ANALYSIS

¶ 47 On appeal, Pamela challenges the trial court's: (1) denial of her motions to continue the trial; (2) granting of James's motion for Rule 219 sanctions (barring testimony); (3) granting of James's motion for section 508(b) sanctions (750 ILCS 5/508(b) (West 2020)) (attorney fees); and (4) decision to impute $50,000 in income to Pamela for the purpose of calculating maintenance. James cross-appeals, arguing that the trial court did not follow the strictures of section 504(f) of the Act when it ordered that James secure his maintenance obligation with a life insurance policy. 750 ILCS 5/504(f) (West 2020). For the reasons that follow, we reject these arguments and affirm in all respects.

¶ 48 A. Motions to Continue

¶ 49     Pamela argues that the trial court erred in denying her motions to continue trial. Pamela focuses on the fourth motion to continue, arguing that when, in late March, her eighth attorney was granted leave to withdraw, the trial court did not provide her sufficient time to secure an attorney who understood the complexity of the case.

¶ 50     Section 2-1007 of the Code allows for extension of time and continuances upon the showing of good cause. That section provides in relevant part: "Extension of time and continuances. On good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment." 735 ILCS 5/2-1007 (West 2020).

¶ 51     However, litigants do not have an unfettered right to a continuance. *Merchants Bank v. Roberts*, 292 Ill. App. 3d 925, 927 (1997). Factors the trial court may consider when deciding whether to grant a continuance include the movant's diligence, the history of the case, the complexity of the case, docket management, judicial economy, and any inconvenience to the parties. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). Though *Walker* is a criminal case, courts have considered many of these factors in civil cases as well. See, *e.g.*, *Hernandez v. Power Construction Co.*, 73 Ill. 2d 90, 95 (1978) (considering inconvenience and prejudice to the parties); *Reecy v. Reecy*, 132 Ill. App. 2d 1024, 1027-28 (1971) (considering the history of the case, specifically, the number of prior continuances). In the end, each case is decided according to its own facts. *Smith v. Realcoa Construction Co.*, 13 Ill. App. 3d 254, 257 (1973).

¶ 52     The decision to deny a motion to continue, like most decisions made by the trial court in overseeing the courtroom and managing the progress of the trial, is reviewed for an abuse of discretion. *In re D.T.*, 212 Ill. 2d 347, 356 (2004) (courtroom management generally); *Greenberger, Krauss & Tenenbaum v. Catalfo*, 293 Ill. App. 3d 88, 97 (1997) (continuances

specifically). A trial court abuses its discretion when its ruling is "arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94.

¶ 53    The central component of Pamela's argument is that, due to the complexity of the case, she needed more time to secure information about James's employment at Morgan Stanley. However, the trial court determined at a February 2021 hearing that Morgan Stanley had fully complied with discovery, and Pamela has not provided this court with an adequate record to challenge that finding. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 54    Again, at the February 2021 hearing, the trial court found that Morgan Stanley fully complied with discovery. The court accepted Morgan Stanley's position that James had no ownership interest in his clients' accounts, and the information that Pamela requested was irrelevant to the value of the marital estate. Further, the court ordered that Pamela desist from issuing further subpoenas along these lines. The transcripts from the February 2021 hearing are not in the record. As such, we must presume that the trial court's ruling was in conformity with the law and had a sufficient factual basis. See *id*.

¶ 55    The trial court referenced its February 2021 findings in denying the motion to continue. It further noted that it had earlier given Pamela leave to depose James or a representative from Morgan Stanley on the issue as a last-chance means to uncover information she believed was there, and she had chosen not to do so. Given this, and given the trial court's observation that many of Pamela's attorneys withdrew after concluding that they could not ethically advance her position, the trial court's denial of the motion to continue constitutes thoroughly reasonable courtroom

management.   We would further note that much of our analysis mirrors arguments raised in James's brief, to which Pamela does not respond in her reply brief.   There is no error here.

¶ 56                    B. Rule 219 Motion to Bar Testimony

¶ 57    Next, Pamela argues that the trial court abused its discretion when it granted James's March 20, 2021, Rule 219 motion to bar her or any expert from testifying to any issues pertaining to his relationship with Morgan Stanley.   Rule 219(c) authorizes a court to impose a sanction, including barring testimony, due to a party's unreasonable refusal to cooperate in discovery.   Ill. S. Ct. R. 219(c) (eff. July 1, 2002).   Typically, the sanction should be tailored to promote discovery, not merely to punish the dilatory party.   *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 68 (1995).   In crafting a sanction, the court may consider: (1) the surprise to the adverse party, (2) the prejudicial effect of the proffered evidence, (3) the nature of the evidence being sought, (4) the diligence of the party in seeking the evidence, (5) the timeliness of the other party's objection to the evidence, and (6) the good faith of the party offering the evidence.   *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 26.   In considering these factors, the court is vested with discretion to fashion a sanction appropriate to the circumstances.   *Id*.   The court's decision to issue a sanction will not be reversed absent an abuse of discretion.   *Kmoch v. Klein*, 245 Ill. App. 3d 308, 312 (1993).

¶ 58    Here, we cannot say that the trial court abused its discretion.   First, looking at the nature of the evidence (factor 3), we accept the trial court's February 2021 determination that the evidence to date showed that James had no personal ownership in Morgan Stanley's book of business so as to impact the value of the marital estate.   Again, the February 2021 hearing is not in the record. See *Foutch*, 99 Ill. 2d at 391-92.   Further, Pamela submitted no offer of proof showing what her testimony would have been.   See, *e.g.*, *Pempek v. Silliker Laboratories, Inc.*, 309 Ill. App. 3d 972, 984 (1999) (the appellate court declined to consider whether the trial court erred in barring certain

testimony as a discovery sanction because, as there had been no offer of proof, it would be impossible to discern whether the result of the trial would have been any different). She acknowledged that her expert had not formulated an opinion. These circumstances—no offer of proof and no opinion formulated by the expert—assure us that Pamela has not been prejudiced. In addition, we defer to the trial court's assessment that Pamela failed to act with diligence or good faith (factors 4 and 6). Pamela refused to answer discovery questions and failed to submit her expert's report after the deadline had already been extended twice. Finally, as with the last issue, we note that our analysis adopts many of the points raised in James's brief, to which Pamela does not respond in her reply brief. There is no Rule 219 error.

¶ 59                                   C. Section 508(b) Sanction

¶ 60    Pamela argues that the trial court employed improper procedures in awarding James $10,000 in section 508(b) sanctions/attorney fees. She complains that the trial court never conducted a hearing nor required an affidavit from James's counsel such that it could have "an idea of the relationship between Pamela's conduct and the fees incurred by James." For the reasons that follow, Pamela has not persuaded this court that any error occurred and, even if there was an error, the forfeiture and/or invited-error doctrines preclude Pamela from raising a corresponding claim.

¶ 61    Section 508(b) provides:

      "(b) In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively

without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2020).

¶ 62    Unlike section 508(a) (authorizing fee contribution based on the financial resources of the parties) and section 508(c) (authorizing an attorney to pursue fees against a former client), section 508(b) does not expressly require a hearing or an affidavit detailing the fees at issue. 750 ILCS 5/508(b) (West 2020); *cf.* 750 ILCS 5/508(a) (West 2020) ("after due notice and hearing"; "[a]ll petitions for or relating to interim fees and costs under this subsection shall be accompanied by an affidavit"); 750 ILCS 5/508(c) (West 2020) ("[n]o final hearing under this subsection (c) is permitted unless: *** the written engagement agreement is attached to an affidavit of counsel"). Pamela appears to acknowledge this distinction. Nevertheless, she notes that a party is entitled to a hearing on a request for section 508(b) fees, *if* a hearing is requested. *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 236-37 (2008). In addition, attorney fees must be reasonable, as determined by, among other factors, "the time spent, the ability of the lawyers, and the complexity of the work." *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992). While an affidavit may indeed be the surest way to show that the fees were reasonable and related to the other party's misconduct, "the court may also rely on its own knowledge and experience in determining the value of the services rendered." *Id*; *cf. In re Marriage of Sanda*, 245 Ill. App. 3d 314, 320 (1993) (the petitioner's attorneys testified to and submitted verified records as to the time and labor involved in their representation that had occurred *outside* the presence of the court). The trial

court's decision to award section 508(b) sanctions/attorney fees is reviewed for an abuse of discretion. See *Walters*, 238 Ill. App. 3d at 1102 (attorney fees generally).

¶ 63    Here, the trial court had sufficient information, without a hearing, to determine that Pamela engaged in "harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2020). The trial court witnessed Pamela's conduct for itself, repeatedly commenting on Pamela's unnecessary motions to continue and subpoenas to Morgan Stanley. Moreover, as stated in James's signed and certified motion for fees, Pamela's own attorney recognized that the trial should have concluded within 4 days. Instead, it took 13 days. The trial court witnessed this and, based on its commentary regarding Pamela's failure to cooperate during trial, agreed. Again, the court may rely on its own knowledge and experience in assessing the value of services rendered. *Id*. at 1098. Assessing $10,000 for 9 days of unnecessary trial is, if anything, conservative in Pamela's favor. (For example, $10,000 would cover just 4.5 hours at $250 per hour at each of the 9 unnecessary trial dates.) This does not even account for the unnecessary work that James's attorneys performed pretrial in, for example, repeatedly educating Pamela's successive attorneys after earlier attorneys withdrew for ethical reasons.

¶ 64    Even accepting for the purposes of argument that the trial court's procedure was lacking, the forfeiture and/or invited-error doctrines preclude Pamela from raising a claim. Though invited error and forfeiture are different concepts, Pamela's actions in this case could reasonably fit the criteria of either doctrine. Forfeiture occurs when a party fails to object to trial court procedure. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44. Under the invited-error doctrine, a party cannot complain of error that the party induced the court to make or to which the party consented. *In re Marriage of Shulga*, 2019 IL App (1st) 182028, ¶ 29. Consent, or "deliberate acquiescence," in the context of invited error means that the party agreed to the procedure at issue, rather than

merely failed to object, as a matter of trial strategy. *Holloway*, 2019 IL App (2d) 170551, ¶ 45. "The rationale behind [the invited-error] doctrine is that 'it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings'." *Shulga*, 2019 IL App (1st) 182028, ¶ 29 (citing *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)).

¶ 65 Here, on June 7, 2021, James brought the section 508(b) motion to Pamela and the trial court's attention. The court proposed hearing the motion the next day. However, neither party called the motion for hearing. Then, on June 11, 2021, the trial court informed the parties that it would issue a ruling on June 23, 2021. It instructed the parties to submit proposed judgments of dissolution, which they did. James's proposed judgment included a section 508(b) award in an amount to be determined by the trial court. Pamela replied that she would be responding to the section 508(b) issue in a written motion. Pamela filed a written motion, and the motion did not request a hearing. By proceeding in this manner while aware that the trial court planned to rule on the case within a few days, Pamela acted as though she viewed a written motion, as opposed to a hearing, sufficient to address her position. It would be reasonable to characterize these circumstances as a failure to object to the trial court's section 508(b) procedure, thus implicating the forfeiture doctrine. It would also be reasonable, given the *repeated* failures to object and the affirmative decision to file a written response without asking for a hearing, to characterize these circumstances as a deliberate acquiescence to the trial court's section 508(b) procedure. Either way, Pamela's actions preclude her from challenging the trial court's section 508(b) procedure on appeal.

¶ 66 D. Imputation of $50,000 in Income to Pamela

¶ 67 Pamela argues that the trial court erred in imputing $50,000 in income for the purposes of calculating maintenance. The trial court did not use the $50,000 figure to issue a guideline

maintenance award, but it was clearly mindful of the $50,000 figure when it chose to condition Pamela's receipt of any maintenance on the circumstance of James having earned at least $75,000. Pamela does not challenge any other aspect of the maintenance award.

¶ 68    The Act authorizes the trial court to deviate from the statutory guideline amount. 750 ILCS 5/504(b-2)(2) (West 2020). Should the court deviate, it must consider certain statutory factors, one of which is each party's respective earning capacity. 750 ILCS 5/504(b-1)(2); 504(a)(3) (West 2020) (specifically referencing earning capacity). These provisions together authorize a court to impute income when awarding maintenance. See *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. A court may impute income to a party when that party is voluntarily unemployed or has unreasonably failed to take advantage of an employment opportunity. *Id*. We review the trial court's decision to impute income for an abuse of discretion. *Id*. To the extent that the trial court's imputation of income presented a question of fact, particularly its chosen dollar amount, we apply the similarly deferential manifest-weight standard of review. See *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30 (applying manifest-weight review to factual components of the trial court's maintenance award). A finding is against the manifest weight of the evidence if the opposite conclusion is clearly apparent, or if it is unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 69    Here, Pamela argues that the trial court abused its discretion in characterizing her unemployment as voluntary. She also argues that, even if her unemployment *were* voluntary, there was no evidence to support the $50,000 figure. We disagree.

¶ 70    Pamela argues that her unemployment was not voluntary, because she resigned from her job to fulfill certain domestic duties. She needed to be available to navigate her youngest son's special education plans. Beginning in 2020, she needed to be available "to assist the children in

their remote lessons *** due to the pandemic and *** to secure tutors for them." Pamela reminds this court that she had gone on three interviews between October 2018 and February 2019 and, more recently, had networked with several former colleagues.

¶ 71     However, the trial court did not credit these explanations, and we defer to the trial court on matters of witness credibility. See *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 55. The trial court characterized Pamela's actions in quitting her job as "inexplicable." Indeed, Pamela has not explained why her obligations to her children in 2018, when they were ages 16 to 19, was more onerous than in the preceding years when the children were younger and she worked outside the home. Also, Pamela's 2018 decision to resign could not have been influenced by the largely unforeseen 2020 pandemic. The court certainly was not required to find that Pamela's efforts toward her adult children's education prevented her from being employed. As to Pamela's efforts in securing new employment, we again defer to the trial court's general assessment that Pamela was not credible and that her efforts were insufficient. The trial court reasonably afforded great weight to Pamela's voluntary resignation and less weight to Pamela's current efforts to secure new employment.

¶ 72     Pamela's argument that there was no evidence to support the $50,000 amount is without merit. Instead, the trial court's $50,000 figure was entirely reasonable based on the evidence. The trial court averaged Pamela's income from her last four years of employment to be $46,000. However, excluding the year that Pamela worked part-time, the average was $56,000. The court considered each of these figures, considered that Pamela's skills were current, and arrived at $50,000. This was not an abuse of discretion nor was it against the manifest weight of the evidence.

¶ 73            E. Cross-Appeal: Securing Maintenance with Life Insurance

¶ 74    On cross-appeal, James argues that the trial court did not comply with section 504(f) of the Act when it ordered that James secure his maintenance obligation with an insurance policy on his life.  750 ILCS 5/504(f) (West 2020).  Section 504(f) provides:

"(f) Maintenance secured by life insurance. An award ordered by a court upon entry of a dissolution judgment or upon entry of an award of maintenance following a reservation of maintenance in a dissolution judgment may be reasonably secured, in whole or in part, by life insurance on the [maintenance] payor's life on terms as to which the parties agree or, if the parties do not agree, on such terms determined by the court, subject to the following:

(1) With respect to existing life insurance, *provided the court is apprised through evidence, stipulation, or otherwise as to level of death benefits, premium, and other relevant data and makes findings relative thereto*, the court may allocate death benefits, the right to assign death benefits, or the obligation for future premium payments between the parties as it deems just.

(2) To the extent the court determines that its award should be secured, in whole or in part, by new life insurance on the payor's life, the court may only order:

(i) that the [maintenance] payor cooperate on all appropriate steps for the payee to obtain such new life insurance; and

(ii) that the payee, at his or her sole option and expense, may obtain such new life insurance on the payor's life up to a maximum level of death benefit coverage, or descending death benefit coverage, as is set by the court, such level not to exceed a reasonable amount in light of the court's

award, with the payee or the payee's designee being the beneficiary of such life insurance." 750 ILCS 5/504(f) (West 2020).

¶ 75 James argues that the trial court did not comply with: (1) the statute's implicit threshold requirement that the trial court first find that it is necessary to secure the maintenance award with life insurance; and (2) the subsection (f)(1) requirement that existing life insurance may be used to secure the maintenance only after the court is apprised of and considers the level of death benefits, the premium, and other relevant data. The first part of James's argument implicates policies maintained by both James and Pamela. The second part of James's argument implicates only existing policies maintained by James. James notes that, when a court operates under the strictures of a statute, it must proceed within the confines of that law. *In re Haley D.*, 2011 IL 110886, ¶ 92. Further, the construction of a statute is a question of law, reviewed *de novo*. *Brill*, 2017 IL App (2d) 160604, ¶ 40.

¶ 76 We begin by rejecting James's premise that the trial court did not first find that it was necessary to secure the maintenance award with life insurance and that, even if it did, the evidence was insufficient to support the same. Pamela's proposed judgment included a requirement that her maintenance award be secured by life insurance. The trial court considered each party's respective proposed judgment and ultimately ordered that the maintenance be secured by life insurance. This is a finding. Moreover, the evidence supported this finding. The court heard extensive evidence regarding the parties' financial circumstances, even referring to the circumstances as "dire." James does not challenge the court's characterization of the parties' finances. Indeed, the court accepted James's characterization of the parties' finances as limited as opposed to Pamela's characterization of the parties' finances as ample. Also, James does not point to any evidence to support that it was

not appropriate to secure the maintenance award with life insurance. In light of this, it was reasonable for the trial court to secure Pamela's maintenance with a life insurance policy.

¶ 77 The second part of James's argument—that the trial court improperly secured the maintenance award with an existing life insurance policy without first being apprised of and considering the level of death benefits, the premium, and other relevant data—is, to at least some degree, barred under the forfeiture and/or invited-error doctrines. See *Holloway*, 2019 IL App (2d) 170551, ¶ 45; *Shulga*, 2019 IL App (1st) 182028, ¶ 29. Again, the trial court instructed the parties to submit proposed judgments of dissolution, which would double as a closing argument. James did not object to this procedure, implicating forfeiture. Moreover, he affirmatively submitted a proposed judgment, arguably entering the realm of invited error. Pamela's proposed judgment contained a requirement that the maintenance award be secured by a $1.4 million life insurance policy maintained by James. James chose not to respond, either to the argument that it was necessary to secure the maintenance award with life insurance or the $1.4 million amount. The court, *sua sponte*, lowered the proposed amount to $1 million. This is true even though, as we will discuss, there is evidence in the record concerning existing life insurance to which James could have pointed.

¶ 78 To the extent that James argues that the trial court's alleged failure to comply with subsection (f)(1) rendered its order void (although he does not use that precise term) for failure to consider the "relevant data," we would disagree. Here, although the trial court commented that it could not recall testimony of existing life insurance, there is, in fact, evidence of existing life insurance in the record. James's paystubs from 2018, 2019, and 2020—covering the time that the petition for the divorce remained pending—show deductions for life insurance premiums. The highest premium amount was just over $220 annually, or just under $20 per month. This presents

a *de minimis* expense in the context of James's total maintenance obligation. See *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1039 (2008) (where, under an earlier version of the Act, the court considered the reasonableness of the premium in the context of the total maintenance amount). While true that the trial court was unable to reference the amount of the existing death benefit, this was due, in large part, to James's failure to respond to Pamela's proposed judgment. The $1 million total amount was based on the court's thorough review and assessment of the parties' finances. The $1 million amount does not strike this court as *per se* unreasonable in light of the parties' finances.

¶ 79    Also, despite the trial court's "failure to recall" comment, it demonstrated its efforts to comply with the statutory scheme:

> "I'm certainly paraphrasing, but the Court cannot order [the maintenance payor to obtain] life insurance that [he] doesn't already have[.] *** So, therefore, what the Court will order is that James, at his expense, is to maintain any and all life insurance benefits that were in existence at the time of the filing of petition and/or the date of judgment, whichever has a greater level of benefit."

In other words, the trial court determined that a $1 million total death benefit was the correct amount, and, working with the evidence it had, it allocated responsibility for that amount based on what existed at the relevant time periods.

¶ 80    Having determined that the trial court reasonably sought to secure the maintenance obligation with a life insurance policy, it is unclear what further relief James could possibly obtain. James argues that the evidence was insufficient to support the $1 million amount—a point we disagree with based on the trial court's intimate knowledge of the parties' finances. He also argues that the evidence was insufficient to show the death benefit of the existing policy. That singular

component of James's argument might be correct, but what, in that case, would the remedy be? It would be to remand for a prove-up on that isolated question. This, however, is essentially the relief that the trial court already has built into its order. The trial court ordered James to disclose proof of his life insurance within 30 days. The paystubs indicate he had some existing life insurance. Along with proof of the same, a death benefit amount will be disclosed. Then, Pamela will be on notice as to how much, if any, she would like to supplement that amount, within the overall limit of $1 million. The trial court did not err in requiring that the maintenance award be secured by life insurance or, under the circumstances of this case, in crafting its corresponding order.

¶ 81                                III. CONCLUSION

¶ 82    For the reasons stated, we affirm the trial court's judgment.

¶ 83    Affirmed.